## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,

v.

## CONTINUITY PROGRAMS INCORPORATED, a Michigan Corporation, Defendant.

### No. 92–CV–72973–DT.

United States District Court,
E.D. Michigan, S.D.

Dec. 23, 1993.

9. Defendants have so testified at deposition. No contrary evidence has been offered.

Bart M. Feinbaum (argued), Trial Atty., Adele Rapport, Regional Atty. and David Ingram, Supervisory Trial Atty., E.E.O.C., Detroit, MI, for plaintiff.

D. Michael Kratchman, Southfield, MI, for defendant.

## MEMORANDUM OPINION AND ORDER

WOODS, District Judge.

This matter having come before the court for trial on December 6, 1993. The court, having considered the evidence submitted and the legal arguments of the parties, enters the following Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P 52(a).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I. FINDINGS OF FACT

Defendant Continuity Programs Incorporated ("Continuity") commenced business in 1973. It operates direct mail follow-up services primarily to automobile dealerships and real estate agencies. Defendant hired the Charging Party, Margaret A. McLemore ("McLemore"), on October 29, 1989. Defendant paid McLemore $5.50 per hour. McLemore was employed full-time until December 17, 1990, when she was laid-off.

In early 1990, McLemore became pregnant. In late October 1990, when her pregnancy was nearing its end, McLemore requested and received a one week vacation from November 5 through November 9, 1990. It was agreed that McLemore's maternity leave would commence on November 12, 1990 and end on December 17, 1990. McLemore informed defendant's data processing operations manager, Michael Mould ("Mould"), of her intention to return to her position as data entry clerk at the conclusion of her maternity leave.

McLemore continued to work at Continuity through November 1, 1990, when she left after experiencing labor pains. McLemore delivered her child on November 2, 1990. On the last day of her maternity leave, McLemore received a letter from Mould, notifying her that she was laid-off effective immediately. The letter explained that Continuity was experiencing a "current downturn in business" and did not have the work to support her salary. Mould could not predict how long the downturn would last, but envisioned little opportunity for improvement through the middle of 1991.

Homeowners Marketing Services ("Homeowners") was previously Continuity's largest customer, accounting for 35–40% of total company business. Continuity had been doing business with Homeowners since 1983. On August 31, 1990, Homeowners' then current contract with Continuity expired. Ross David Epps ("Epps"), President of Continuity, commenced negotiations with Homeowners in hopes of renewing the contract. In late October 1990, Epps began having a feeling that Continuity would lose the Homeowners account. In a memo dated November 27, 1990, Epps informed his managers that Homeowners would in fact not be renewing its contract, but would continue submitting tickets for data entry until December 31, 1990. Epps met with the managers a few days later to discuss the impact of losing the Homeowners account and to receive suggestions on where the company could cut costs.

The monthly summary of ticket activity for the year 1990 was as follows:

| | TICKETS | $ VOLUME |
|---|---|---|
| 01/31/90 | 6,916 | 81,824.70 |
| 02/28/90 | 5,212 | 59,314.80 |
| 03/31/90 | 6,101 | 70,114.55 |
| 04/30/90 | 7,286 | 84,324.85 |
| 05/31/90 | 7,760 | 93,041.45 |
| 06/30/90 | 7,502 | 94,639.10 |
| 07/31/90 | 6,932 | 84,308.00 |
| 08/31/90 | 7,506 | 96,848.35 |
| 09/30/90 | 6,558 | 81,471.85 |
| 10/31/90 | 6,198 | 77,443.90 |
| 11/30/90 | 5,364 | 67,917.80 |
| 12/31/90 | 4,843 | 61,353.25 |
| | 78,178 | 952,602.60 |

On October 29, 1990, approximately two weeks prior to the start of McLemore's scheduled maternity leave, Mould hired Patricia Stinogel ("Stinogel") as a full-time data entry clerk. At that time, Continuity had experienced three consecutive months of downward enrollment ticket activity, and was using reserve funds to maintain its operating level. This was also when Epps believed defendant would be losing the Homeowners account. The hiring of Stinogel increased defendant's complement of data entry clerks to three-full time employees: McLemore, Melinda Parker, and Stinogel, for a period of three days. At this time, McLemore was more experienced than Stinogel as a data entry clerk. McLemore and Parker trained Stinogel in the data entry clerk position.

Stinogel was hired at $6.00 per hour, $.50 cents more per hour than McLemore was earning as of the date she left on maternity leave. At the time Stinogel was hired as McLemore's replacement, defendant had at least 12 employees who could have "covered" for McLemore during her maternity leave. Between November 1, 1990 and December 17, 1990, the time of McLemore's maternity leave, Continuity paid salary costs to Stinogel in the amount of $1,294.50.

Stinogel remained a full-time data entry clerk subsequent to McLemore's lay-off. During the payroll period covering December 27, 1990 through July 11, 1991, Stinogel received $7,110.60 in gross wages from defendant. Had McLemore been retained during this period, her gross wages would have totalled $6,519.85. This would have saved defendant $590.75.

Continuity's monthly summary of ticket activity in 1991 was as follows:

| | TICKETS | $ VOLUME |
|---|---|---|
| 01/31/91 | 2,968 | 34,805.40 |
| 02/28/91 | 2,757 | 33,859.95 |
| 03/31/91 | 3,077 | 39,541.80 |
| 04/30/91 | 4,444 | 59,092.30 |
| 05/31/91 | 4,424 | 64,422.05 |
| 06/30/91 | 4,784 | 69,595.00 |
| 07/31/91 | 4,986 | 74,502.10 |
| 08/31/91 | 4,809 | 67,162.25 |
| 09/30/91 | 5,706 | 81,939.60 |
| 10/31/91 | 4,347 | 62,430.45 |
| 11/30/91 | 4,368 | 65,622.85 |
| 12/31/91 | 3,513 | 53,503.35 |
| | 50,183 | 706,477.10 |

Continuity's total sales for the years 1989–1991 were 1989—$1,880,737.00; 1990—$1,568,962.00; 1991—$1,294,843.00. These figures resulted in net income as follows: 1989—$342,555.00; 1990—($58,823.00); 1991—($203,543.00)

In January 1991, despite the market downturn in ticket activity and net loss, Epps authorized a five percent salary increase for 15–20 employees. The employees received lump-sum payments in July 1991, consisting of a $50.00 bonus for each month they had to wait for the raise, coupled with the retroactive five percent increase. Such bonuses and

salary increases cost Continuity between $4,500.00 and $6,000.00.

In addition, despite his awareness of the loss of the Homeowners account, and the downturn in business, Mould encouraged McLemore in his December 17, 1990 termination letter to seek unemployment compensation as soon as possible. Mould was aware that companies are rated by the State of Michigan based on the amount of unemployment benefits paid out. Employers paying out more benefits are taxed at higher rates. Mould knew, therefore, that his suggestion would result in additional costs to the company. Mould was also aware that had Stinogel been laid-off rather than McLemore, defendant would not have had to pay her unemployment benefits.

Generally when employees go out on non-pregnancy leave, Continuity does not hire replacements. For example, Estella Richardson, an employee in the Account Services Department, was permitted to take sick leave during October and November, 1990. Another clerk covered Richardson's duties during her absence. Defendant also permitted Richardson to take time off work without pay from January 14, 1991 through January 21, 1991, and allowed her to "borrow" time against her 1991–1992 vacation entitlement from April 29, 1991 to May 10, 1991. Instead of hiring a replacement, defendant always allowed Richardson to return to work after her leaves of absence. Both Richardson and McLemore's positions at Continuity are clerical.

Defendant's maternity leave policy, in effect at the time of McLemore's leave provides:

> Leave of Absence for maternity reasons will be recorded and treated as any other medical leave of absence ... Just like any other leave, an attempt will be made to place an associate returning from maternity leave in the same position as at the time of leaving. Sometimes this is not possible. In such cases the associate will be returned to work and given a position to fill the Company's needs. If no position is available, we will try to give the associate first preference for the first available opening within the Company for which the associate is determined qualified by CPI.

McLemore contacted Mould on several occasions after December 17, 1990 to inquire whether there were any openings for work. Mould informed McLemore there was no work and once again encouraged her to seek unemployment benefits. The final time McLemore spoke with Mould, he stated he would notify her as soon as there was an opening. Despite the express language of the maternity policy, however, Mould never contacted McLemore when future openings arose.

On April 1, 1991, defendant hired Debrah L. Bradshaw as a full-time receptionist at $6.50 per hour. McLemore was qualified to perform this job, as she had commenced her employment with defendant as a receptionist. McLemore was not notified, offered or even considered for the position. Bradshaw terminated her employment on April 12, 1991.

On April 16, 1991, defendant hired Deborah A. Kollar as a full-time receptionist at $6.25 per hour. McLemore was again not notified, offered, or even considered for the position. On September 30, 1991, defendant hired Tammy Senkbell as a full-time receptionist at $6.00 per hour. McLemore was not notified, offered, or considered for the position. In addition to data entry, McLemore performed ticket coding every day. On August 12, 1991, without considering McLemore, defendant hired Sherri A. Lockhart as a full-time ticket coder at $6.75 per hour.

Finally, on October 19, 1991, defendant advertised in the *Spinal Column Newsweekly* seeking part-time experienced data entry clerks. Mould did not consider McLemore for the positions advertised. In fact, defendant has never contacted McLemore about returning to work. McLemore was the only employee laid-off from her employment on December 17, 1990, and no other employee has been laid-off since that time.

## II. CONCLUSIONS OF LAW

The court has jurisdiction over the instant matter pursuant to 28 U.S.C. §§ 1331 and 1345. This action is authorized pursuant to § 706(f)(1) and (3) of Title VII of the Civil Rights Acts of 1964, as amended 42 U.S.C.

§ 2000e, *et seq.* Section 703(a)(1) of Title VII, 42 U.S.C. § 2000e–2(a) provides:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin....

Discrimination because of pregnancy, childbirth or related conditions is expressly included in the definition of actionable sex discrimination, by virtue of the Pregnancy Discrimination Act, passed in 1978 to amend Title VII, and codified at 42 U.S.C. § 2000e(k).

In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the United States Supreme Court established an analytical framework for Title VII cases. First, the plaintiff must establish a prima facie case of racial discrimination. *Id.* at 802, 93 S.Ct. at 1824. The burden of production then shifts to the defendant to articulate some "legitimate, nondiscriminatory reason" for its actions against the plaintiff. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1980). The defendant need only present evidence that raises a genuine issue of material fact; it is not necessary to prove that the proffered reasons actually motivated the defendant's action. *Id.* at 254–55, 101 S.Ct. at 1094. "A reason is legitimate for purposes of the civil rights laws if it is non-discriminatory, even if it is mean-spirited, ill-considered, inconsistent with humane personnel policies, or otherwise objectionable." *Galbraith v. Northern Telecom, Inc.,* 944 F.2d 275, 282 (6th Cir.1991), *cert. denied* —— U.S. ——, 112 S.Ct. 1497, 117 L.Ed.2d 637 (1992), *citing Jones v. Continental Corp.,* 789 F.2d 1225, 1233 (6th Cir.1986).

If the defendant meets this burden, the "prima facie case is rebutted." *St. Mary's Honor Center v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993)

citing *Burdine,* 450 U.S. at 255, 101 S.Ct. at 1094–95. The plaintiff then must demonstrate by a preponderance of the evidence that she has been the victim of intentional discrimination. *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. A Title VII plaintiff always retains the "ultimate burden of persuasion." *St. Mary's,* —— U.S. at ——, 113 S.Ct. at 2749.

In its Order dated May 11, 1993, the court found plaintiff had set forth a prima facie case of discrimination, and defendant satisfied its burden of articulating a justification for its lay-off of McLemore coincident with her return from maternity leave. *See* Order Granting in Part and Denying in Part Plaintiff's Motion for Partial Summary Judgment and Denying Defendant's Motion for Summary Judgment, dated May 11, 1993. The court denied plaintiff's Motion for Summary Judgment on the issue of liability for sex discrimination finding a genuine issue of material fact existed regarding the true reason for defendant's action.[1] The sole issue remaining for the trier of fact, therefore, is whether defendant's economic necessity justification was merely a pretext for unlawful discrimination.

■ A plaintiff may demonstrate pretext by showing a discriminatory motive was more likely the reason for the employer's actions, or that "the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095; *see also, Pitts v. Michael Miller Car Rental,* 942 F.2d 1067, 1071 (6th Cir.1991); *Irvin v. Airco Carbide,* 837 F.2d 724, 726 (6th Cir.1987). The court's disbelief of a defendant's justification coupled with the facts establishing a plaintiff's prima facie case, may be sufficient to demonstrate intentional discrimination. *St. Mary's,* —— U.S. at ——, 113 S.Ct. at 2743.

■ Defendant has supported its economic necessity rationale by objective evidence. The court has no reason to question that the amount of ticket activity declined significantly from 1990–1991, and that Continuity suf-

---

**1.** The court granted summary judgment in favor of plaintiff on the issue of liability for unlawful sex discrimination in employment arising out of defendant's failure to hold open plaintiff's position during her maternity leave.

fered a net loss in those two years. Despite this cogent evidence, plaintiff has nonetheless set forth substantial evidence to support its claim of intentional discrimination. Plaintiff produces the following facts to demonstrate that defendant's proffered justification is "unworthy of credence."

1. McLemore was the only employee laid-off from her employment on December 17, 1990, and no other employee has been laid-off since that time.

2. At the time Continuity hired Stinogel, it had experienced three consecutive months of downward enrollment ticket activity, and was using reserve funds to maintain its operating level. In addition, President Epps had a feeling it would be losing the Homeowners account. The hiring of Stinogel increased defendant's complement of data entry clerks from two to three full-time employees.

3. Although less experienced, Stinogel was paid $.50 cents more per hour than McLemore was earning as of the date she left on maternity leave.

4. During the time of McLemore's maternity leave, Continuity paid salary costs to Stinogel in the amount of $1,294.50, despite the fact that there were twelve other employees who could have "covered" for McLemore.

5. Defendant laid-off McLemore, but retained Stinogel, a higher salaried employee.

6. In January 1991, Epps authorized a five percent salary increase for 15–20 employees. Such salary increases plus bonuses cost the company between $4,500.00 and $6,000.00.

7. Although admittedly knowing that McLemore's collection of unemployment benefits would result in increased costs to defendant, Mould encouraged McLemore to seek benefits as soon as possible.

8. With the exception of Stinogel, defendant had a general policy of not hiring replacement workers when an employee left on non-pregnancy leave.

9. Defendant failed to follow the express terms of its maternity policy, by never con-

sidering McLemore for any future openings for which she was qualified.

The court finds defendant's actions in hiring, retaining, and paying a higher salary to Stinogel, its expenditure of at least $4,500.00 in salary increases and bonuses, and Mould's encouragement of McLemore to seek unemployment benefits enigmatic in light of its then financial state. On one hand, defendant claims the empirical data ·of its economic downturn justifies the lay-off of McLemore. Defendant's conduct, on the other hand, belies that proposition.

■ An employer's customary employment practices are relevant when considering pretext. *Scales v. J.C. Bradford and Co.,* 925 F.2d 901, 906 (6th Cir.1991), *citing EEOC v. Roadway Express Inc.,* 750 F.2d 40 (6th Cir.1984). Here, defendant did not "play by its own rules" with respect to McLemore. As evidenced by defendant's treatment of Estella Richardson, and Michael Mould's testimony, Continuity generally doesn't hire replacement workers when employees go out on non-pregnancy leave. In the instant case, however, McLemore was replaced by Stinogel approximately two weeks before her scheduled maternity leave was to begin. In addition, despite the express language of its maternity leave policy, and McLemore's repeated phone calls inquiring about job openings, defendant never considered McLemore for any future openings for which she was qualified.

The final factors weighing heavily against defendant's position, include the facts that Mould failed to mention the loss of the Homeowners account in a response letter to the EEOC dated February 25, 1991, and in response to plaintiff's interrogatories dated September 28, 1992. Additionally, despite ample opportunity during discovery, defendant failed to produce crucial evidence in support of its economic justification until the eve of trial.[2] Such conduct certainly calls defendant's veracity into question.

■ A plaintiff is not required to prove intentional discrimination by direct evidence.

2. The evidence consisted of a November 27, 1990 memorandum reflecting the loss of the Homeowners account, and testimony and documentary evidence concerning four women who allegedly

were allowed to return to work after maternity leave. The court notes that although it denied plaintiff's motion in limine to exclude such evi-

*Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. A plaintiff may satisfy her burden by demonstrating defendant's justification is a mere pretext for discrimination. *Id.* at 253, 101 S.Ct. at 1093. In the present case, the court is satisfied plaintiff has met this burden. In light of the overwhelming evidence suggesting discrimination, the court rejects defendant's proffered reasons for terminating McLemore's employment. This conclusion, coupled with the elements of plaintiff's prima facie case, are sufficient for a finding of intentional discrimination. *St. Mary's,* —— U.S. at ——, 113 S.Ct. at 2749.[3]

For the above-stated reasons, and per the parties joint stipulation, the court awards plaintiff judgment against defendant in the amount of $8,464.58, said amount constituting $6,606.52 in backpay and $1,858.06 in interest. Post-judgment interest shall continue to run at the statutory rate until the judgment is fully satisfied. 28 U.S.C. § 1961(a). In addition, defendant is permanently enjoined from engaging in any employment practice which discriminates on the basis of sex. 42 U.S.C. § 2000e–5(g). Plaintiff's request for costs is DENIED.

So Ordered.

dence, defendant failed to introduce *any* evidence concerning these four women at trial.

**3.** For the record, the court is satisfied that Epps was unaware of all the facts surrounding the hiring of Stinogel, and the lay-off of McLemore. As President of Continuity, however, Epps is responsible for the actions of his managers.