Lynn Gansar ZATARAIN

v.

**WDSU–TELEVISION, INC.
and John Carpenter.**

Civ. A. No. 94–1018.

United States District Court,
E.D. Louisiana.

Jan. 18, 1995.

ran, Adams & Reese, New Orleans, LA, for Lynn Ganzar Zatarain.

Thomas Harry Kiggans, Phelps Dunbar, Baton Rouge, LA, Harry A. Rosenberg, Maria Nan Alessandra, David M. Korn, Phelps Dunbar, New Orleans, LA, for WDSU–Television Inc.

Thomas Harry Kiggans, Harry A. Rosenberg, Maria Nan Alessandra, David M. Korn, New Orleans, LA, for John R. Carpenter.

Harry A. Rosenberg, Maria Nan Alessandra, David M. Korn, New Orleans, LA, for Pulitzer Broadcasting Co.

## ORDER GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT

VANCE, District Judge.

Before the Court is the motion for partial summary judgment of defendant WDSU–Television, Inc. ("WDSU") and John Carpenter seeking dismissal of plaintiff's claim under the Americans With Disabilities Act (ADA) and the motion of defendant John Carpenter ("Carpenter") seeking dismissal of all of plaintiff's claims against him individually. The Court, having reviewed the legal memoranda of the parties and heard oral argument, grants the motions for the reasons set forth below.

### I. BACKGROUND

Plaintiff, Lynn Gansar Zatarain, was employed by WDSU from 1983 to November of 1992 as a reporter and anchor person. In October of 1990, she and WDSU entered into a personal services contract that would expire on November 30, 1992. Beginning in August or September of 1990, plaintiff anchored three evening newscasts at 5:00 p.m., 6:00 p.m., and 10:00 p.m. As the only anchor person for three newscasts, plaintiff was the highest paid news anchor at WDSU.

In July of 1992, plaintiff began fertility treatments in an effort to conceive a child. She informed both her news director, Linda Levy, and her co-anchor, Norman Robinson, of these developments. Others, including defendant John Carpenter, knew of her desire and attempts to get pregnant. At that time,

Michael G. Crow, Richard Anthony Goins, Janis van Meerveld, Michael McGrath Du-

plaintiff worked approximately eight hours per day. She arrived at work at 3:00 p.m. and left after the 10:00 p.m. newscast. When she began receiving hormone shots, as part of her infertility treatment, she told WDSU that she needed to get the shots between 4:00 and 6:00 p.m. WDSU allowed her to report to work later than 3:00 p.m. in order to visit the doctor's office before coming to work.

Since plaintiff's personal services contract would expire in November 1992, on September 30, 1992, WDSU offered her a new contract with $168,000 as an annual salary. Plaintiff rejected this offer because she wanted more money and a multi-year guarantee. WDSU made a second offer on October 23, 1992 with a higher salary and a two-year guarantee. The parties disagree on whether plaintiff accepted this offer. During the same time frame, plaintiff claims that she had other job offers for both prime-time and daytime anchor jobs with CNBC. Zatarain depo. at 72–73, 77–78.

Thereafter, in early November 1992, plaintiff for the first time informed WDSU that her doctor had recommended a reduced work schedule during the period of her fertility treatments—that she go to work at 5:00, do the 6:00 newscast, then go home and return at 9:00 for the 10:00 newscast. Zatarain depo. at 154. Plaintiff claims that she asked for the modification for up to four months. *Id.* at 159. Defendants stated at oral argument that plaintiff never indicated she would accept less money for this reduction of work. Plaintiff claims she offered to do special reports on the subject of fertility, following her own efforts and those of others to deal with fertility problems. Complaint at ¶ 11. Defendants also stated that plaintiff wanted the terms of the reduced work schedule included in the new personal services contract. WDSU was not amenable to that arrangement. Plaintiff's personal services contract was not renewed.

Plaintiff brings this lawsuit alleging that she was discriminatorily discharged from em-ployment by WDSU in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* Defendants claim that partial summary judgment is appropriate because plaintiff's ADA claim is deficient in several respects. First, defendant contends that "infertility" (defendant's terminology) or a reproductive disorder (plaintiff's terminology) is not a "disability" under the ADA. Second, defendants claim that plaintiff's condition did not substantially limit her ability to engage in a "major life activity" within the meaning of the ADA. Defendant John Carpenter seeks dismissal of all of plaintiff's claims against him contending that he is not liable under Title VII or the ADA because he was not plaintiff's "employer."

## II. ANALYSIS

### A. Plaintiff's ADA Claim

■ In order for plaintiff to state a claim under the ADA, she must have a disability, which is defined as a physical or mental impairment that substantially limits one or more of the major life activities. 42 U.S.C. § 12102(2). An ADA plaintiff must therefore satisfy two requirements: (1) plaintiff must have an impairment; and (2) the impairment must interfere with a major life activity.

#### 1. Impairment

■ There is evidence sufficient to withstand summary judgment on the issue of whether plaintiff has an impairment. Under the ADA regulations, she has an impairment if she has a "physiological disorder ... affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, *reproductive* ..." 29 C.F.R. § 1630.2(h)(1) (emphasis added). Defendants contend that plaintiff's condition is not a physiological disorder, or even the product of such a disorder, but a symptom of job stress or age.[1] Defendant

---

1. Plaintiff was approaching 40 years of age when she began undergoing fertility treatments. Her doctor testified that her "biological clock had almost ticked." Dr. Curole depo. at 96. For the purposes of the ADA, "advanced age" is not in and of itself an impairment, although medical conditions associated with age, such as osteopo-

claims that since neither age nor stress associated with employment are physiological disorders, plaintiff is not disabled.[2]

■ While it is true that plaintiff's doctors have not been able to pinpoint a specific cause of plaintiff's infertility, the record does not warrant summary judgment on WDSU's contention that it is solely the result of age or stress. Plaintiff has proffered expert testimony to the effect that she suffers from a disorder of the reproductive system of an undiagnosed nature, which exists separate and apart from age and stress.[3] Accordingly, the Court cannot find as a matter of law that plaintiff does not have an impairment in the nature of a physiological disorder of the reproductive system.

### 2. Major Life Activity

Plaintiff's complaint contends that she was significantly restricted in the major life activity of working. *See* Complaint count 2, ¶ 2. The ADA regulations include "working" as a major life activity, along with caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, and learning. 29 C.F.R. § 1630.2(i).

■ Plaintiff also contends that reproduction itself can be a major life activity. Plaintiff relies on *Pacourek v. Inland Steel Co.*, 858 F.Supp. 1393 (N.D.Ill.1994). However, the structure of the ADA and its regulations indicate that the major life activity that is allegedly limited is separate and distinct from the impairment that limits it. Plaintiff's construction is faulty because it would allow her to bootstrap a finding of substantial limitation of a major life activity on to a finding of an impairment. To articulate plaintiff's analysis, she claims to have a

reproductive disorder that interferes with the major life activity of reproduction, which is substantially limited because of her disorder. This analysis is circular and unpersuasive.

■ Furthermore, finding "reproduction" to be a "major life activity" would be inconsistent with the illustrative list of major life activities provided in the ADA regulations. Reproduction is not an activity engaged in with the same degree of frequency as the listed activities of walking, seeing, speaking, breathing, learning, and working. *See* 29 C.F.R. § 1630.2(i). A person is required to walk, see, learn, speak, breath, and work throughout the day, day in and day out. However, a person is not called upon to reproduce throughout the day, every day. This Court cannot reasonably infer that reproduction is a "major life activity" based on an analysis of the illustrative list of activities in the regulation. Treating reproduction as a major life activity under the ADA would be a conscious expansion of the law, which is beyond the province of this Court. Therefore, the only cognizable "major life activity" implicated here is found in plaintiff's claim that her reproductive disorder substantially limited her ability to work.

■ In order for plaintiff to prevail on this argument, she must demonstrate more than an impairment of her ability to serve as a prime-time news anchor for WDSU. Rather, the regulations provide that with respect to the major life activity of *working*, the term *substantially limits* means "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes ... *The inability to perform a single particular job does not constitute a*

---

rosis, can be. 29 C.F.R. Part 1630, App. § 1630.2(h) (1994).

**2.** Plaintiff's doctor was also of the opinion that reduced work-related stress would enhance her chances of getting pregnant. Ex. C to Plaintiff's Opposition Memorandum, Dr. Curole Report at 2. The EEOC's Technical Assistance Manual on the ADA states the following about job stress:

Stress and depression are conditions that may or may not be considered impairments, depending on whether these conditions result from a documented physiological or mental disorder.

For example: A person suffering from general "stress" because of job or personal life pressures would not be considered to have an impairment.

**3.** *See* Ex. E to Plaintiff's Opposition, Affidavit of Dr. Curole ("Although we have not identified with definite particularity the exact nature of Ms. Gansar's reproductive disorder, it is unlikely that the causes are stress or age. Whatever the nature of her reproductive disorder, that disorder exists separate and apart from age and stress.").

*substantial limitation in the major life activity of working."* 29 C.F.R. § 1630.2(j)(3)(i) (emphasis added). The appendix to the regulations offers interpretive guidance. It states that "an individual is not substantially limited in working simply because he or she is unable to perform a particular job for one employer, or because he or she is unable to perform a specialized job or profession requiring extraordinary skill, prowess or talent." 29 C.F.R. Part 1630, App. § 1630.2(j) (1994). For example, a person who cannot be a commercial airline pilot because of a minor vision impairment, but who could be a commercial airline co-pilot or a pilot for a courier service, "would not be substantially limited in the major life activity of working." *Id.*

▊ There is no evidence here that plaintiff's reproductive disorder significantly restricted her ability to perform a class of jobs or a broad range of jobs in various classes. On the contrary, the record indicates that she could still work in broadcasting as an anchor person. Her treating physician testified that her condition would not prevent her from performing her full job duties as an anchor person. *See* Ex. 2 to Defendant's Reply Memorandum, Dr. Curole Depo. at 205–06. What her physician apparently objected to was her performing three back-to-back broadcasts in the evening hours. Thus, while plaintiff produced evidence that she requested a reduced work schedule to permit rest between broadcasts and to fit in her afternoon hormone shots, she produced no evidence that she was impaired from performing morning or noon broadcasts or a combination of daytime and evening broadcasts. The record reflects that plaintiff remained capable of performing a job as a news anchor; at most, her condition prevent-

ed her from holding the particular position of prime-time news anchor at WDSU.[4] Indeed, she testified that she had a job offer from CNBC to do daytime coverage of the stock market and Wall Street at the time she was renegotiating her contract with WDSU. Zatarain depo. at 77–78.

The ADA regulations require consideration of the geographic job market to which plaintiff had reasonable access, as well as evidence of general employment demographics and/or recognized occupational classifications that indicate the approximate number of jobs from which the individual would be excluded because of an impairment. 29 C.F.R. § 1630.2(j); Part 1630, App. § 1630.2. This type of evidence was totally lacking here. If anything, the evidence indicated that the geographic job market to which plaintiff had access was national, since plaintiff had contemporaneous offers of employment from a national network. Further, plaintiff presented no evidence of "the number and types of jobs utilizing similar training, knowledge, skills or abilities" within the relevant geographical area "from which [she was] disqualified because of [her] impairment." 29 C.F.R. § 1630.2(j)(2). Therefore, plaintiff has failed to establish that she was "disabled" under the ADA because she has not raised a material issue as to whether she was substantially limited in the activity of working.[5] Defendants' duty to reasonably accommodate her is not triggered without a disability.

## B. John Carpenter's Personal Liability

John Carpenter seeks summary judgment on plaintiff's claims against him personally. Having decided that plaintiff is not "disabled" under the ADA, the Court need only decide if defendant Carpenter is personally

---

4. In her deposition, plaintiff was asked: "During the time that you were undergoing the treatments, except for the time in which you could not physically be at work because you had to be somewhere else to undergo treatment, were you able to perform you job." Plaintiff's response was an unequivocal "Yes". Ex. 2 to Defendant's Motion, Zatarain Depo. at 62.

5. Other factors present here militate against the argument that plaintiff is substantially limited in working within the meaning of the ADA. Plain-

tiff testified that she only requested the accommodation of her work schedule for an outside period of four months. Zatarain depo. at 159. Relevant in assessing the presence of a disability is the "duration or expected duration of the impairment" and its "permanent or long-term impact." 29 C.F.R. § 1630.2(j)(2)(ii), (iii). "Temporary non-chronic impairments of short duration, with little or no long-term or permanent impact, are usually not disabilities." 29 C.F.R. Part 1630, App. § 1630.2(j).

liable under Title VII. Title VII holds an "employer" liable for discrimination against employees based on disability or gender, respectively. John Carpenter, although perhaps a superior of plaintiff's, was an employee of WDSU, just as plaintiff was an employee. The term "employer" means a person engaged in an industry affecting commerce who has fifteen or more employees, and any agent of such person. 42 U.S.C. § 2000e(b). Plaintiff claims that John Carpenter is liable under these statutes as an "agent" of the employer, WDSU.

*Grant v. Lone Star Co.*, 21 F.3d 649 (5th Cir.), *cert. denied*, — U.S. —, 115 S.Ct. 574, 130 L.Ed.2d 491 (1994), held that Title VII did not impose liability on an individual, such as a plaintiff's supervisor. It is true as plaintiff notes that *Grant* was based on the pre–1991 Civil Rights Act, which limited a plaintiff's remedies to back pay and reinstatement, and that this limitation has since been lifted. *See Grant*, 21 F.3d at 653 ("Congress did not intend to impose individual liability for backpay damages under Title VII"). However, *Grant* was also based on other factors, which are still applicable, despite the subsequent change in remedies.

The Fifth Circuit in *Grant* distinguished the language of Title VII from the language of section 1983 of Title 42, which does impose liability on individual defendants. Title VII imposes liability on "employers," whereas section 1983 applies to any "person." *Grant* 21 F.3d at 652. The court stated,

> Congress could have made the individual employee committing or engaging in the discriminatory acts liable for damages. It did not. Congress could have provided that an individual employee is prohibited from engaging in discriminatory conduct. Instead, only an individual meeting the definition of an "employer" is so prohibited.

*Grant*, 21 F.3d at 653.[6] This rationale survives the 1991 amendment.

■ Further, the Fifth Circuit relied on a Ninth Circuit decision that refused to impose individual liability under Title VII, despite the language in the definition of "employer" that includes "any agent of such person." *Miller v. Maxwell's Int'l Inc.*, 991 F.2d 583, 584 (9th Cir.1993), *cert. denied*, — U.S. —, 114 S.Ct. 1049, 127 L.Ed.2d 372 (1994). The Fifth Circuit approved of *Miller's* reasoning that the purpose of the "agent" provision in § 2000e(b) was to incorporate *respondeat superior* liability into Title VII and that there was no reason to stretch the liability of individual employees "beyond the *respondeat superior* principle intended by Congress." *Grant*, 21 F.3d at 649. This construction of the language of the statute survives the 1991 amendment. *Grant* is the latest statement by the Fifth Circuit on the issue of individual liability under Title VII. Except for the discussion of the court's reluctance to hold an individual liable for back pay, the analysis provided in *Grant* survives the 1991 amendments to Title VII. Accordingly,

IT IS ORDERED that defendants' motion for partial summary judgment dismissing plaintiff's ADA claim is GRANTED.

IT IS FURTHER ORDERED that defendant John Carpenter's motion for summary judgment as to his personal liability is GRANTED.

---

6. "Employer" under the ADA was defined as "a person engaged in an industry affecting commerce who has 25 or more employees ... and any agent of such person." 42 U.S.C. § 12111(5)(A). Although the statute was amended effective July 26, 1994 to define an employer as a person with 15 or more employees, plaintiff was employed when 25 or more employees was required.