Mary Jo KRAUEL, Plaintiff,

v.

IOWA METHODIST MEDICAL
CENTER, Defendant.

Civil No. 4–93–CV–10815.

United States District Court,
S.D. Iowa,
Central Division.

Oct. 2, 1995.

Mark D. Sherinian (Hanson, Bjork & Russell, L.L.P.), Des Moines, Iowa, for plaintiff.

Mark A. Casciari (Seyfarth, Shaw, Fairweather & Geraldson), Chicago, Ill., and Thomas Finley (Finley, Alt, Smith, Scharnberg, May & Craig), Des Moines, Iowa, for defendant.

## ORDER

LONGSTAFF, District Judge.

The Court has before it defendant's motion for summary judgment regarding plaintiff's allegations in Count I of her complaint of disability discrimination brought pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq* and her allegations in Count II of her complaint of sex discrimination brought pursuant to the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k) of the Civil Rights Act of 1964.

Defendant moved for summary judgment on Count I of the complaint on May 15, 1995. Plaintiff resisted this motion on June 8, 1995. Defendant filed a reply brief on June 28, 1995. Plaintiff filed a reply brief on July 7, 1995, and Defendant filed a reply brief on August 1, 1995.

Defendant moved for summary judgment on Count II of the complaint on July 25, 1995. Plaintiff resisted this motion on August 15, 1995. Defendant filed a reply brief on August 24, 1995 and plaintiff filed a reply brief on September 11, 1995.

## I. BACKGROUND

Plaintiff, Mary Jo Krauel, is a 41–year–old woman born on October 24, 1953. (Krauel Dep. 4). Krauel has been married since February 23, 1990 (Krauel Dep. 4) and is generally in excellent health. (Krauel Dep. 5).

Since June 1979 plaintiff has worked and continues to work for Iowa Methodist Medical Center ("Hospital"). (Krauel Dep. 7–8). Since at least February 1990, she has worked as a respiratory therapist at the Hospital. (Krauel Dep. 15).

On July 29, 1993, Plaintiff became pregnant through a fertility treatment known as the "Gift procedure" (Krauel Dep. 13) and gave birth to a daughter, her only child, on April 15, 1994. (Krauel Dep. 13). Plaintiff then unsuccessfully attempted to become pregnant without medical intervention for more than one year. (Krauel Dep. 10–11, 44–45).

Since 1987, the Hospital has maintained a written medical benefits plan for employees known as the Healthcare Preferred Plan ("Plan"). (Allyn Affid., ¶¶ 2, 7). The Plan is self-insured in that benefits are paid from Hospital general assets. The Plan has never been subject to any state laws that regulate insurance. (Allyn Affid., ¶ 5). Since 1990, Plan Exclusion No. 31 has excluded medical charges for the treatment of "fertility or infertility problems" and refused to pay benefits for such treatments. (Allyn Affid., ¶¶ 6, 7); (Krauel Dep. Ex. 2 at 105D.3 (1990 Plan)).

Plaintiff has been a participant in the Plan since 1990. (Allyn Affid., ¶ 3). Payment for most of Plaintiff's infertility treatments, including her visits to doctors, certain infertility drugs, and the GIFT procedures (excluding her laparoscopy) were denied under the Plan's exclusion for treatment of "fertility or infertility problems." (Krauel Dep. 87–91).

Krauel testified in her deposition that her inability to have children limits her ability to care for others by preventing her from being able to care for children of her own. (Krauel Dep. 72–73). However, she also stated that she has not experienced any difficulty caring for herself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning or working as a result of her alleged disability. (Krauel Dep. 14–17, 19–20). She also indicated that her infertility has not inhibited her working relationships or opportunities for promotions, pay increases, and other opportunities for advancement. (Krauel Dep. 17–18).

## II. SUMMARY JUDGMENT STANDARD

 Summary judgment is properly granted when the record, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Walsh v. United States,* 31 F.3d 696, 698 (8th Cir.1994). The moving party must establish its right to judgment with such clarity that there is no room for controversy. *Jewson v. Mayo Clinic,* 691 F.2d 405, 408 (8th Cir.1982). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue is "genuine," if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. at 2510. "As to materiality, the substantive law will identify which facts are material: . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

## III. AMERICANS WITH DISABILITIES ACT ("ADA") (COUNT I)

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Disability, under the ADA, is defined as follows:

(g) Disability means, with respect to an individual—

(1) A physical or mental impairment that substantially limits one or more of the major life activities of such individual; . . .

42 U.S.C. § 12102(2).

ADA Section 501(c), 42 U.S.C. § 12201(c), is an insurance safe harbor provision that provides in pertinent part:

Subchapters I through III of this chapter and title IV of this Act shall not be construed to prohibit or restrict—

. . . . .

(3) a person or organization covered by this Act from establishing, sponsoring, observing or administering the terms of a bona fide benefit plan that is not subject to state laws that regulate insurance.

Paragraphs ... (3) shall not be used as a subterfuge to evade the purposes of subchapters I and II of this chapter.

In support of its motion for summary judgment on Count I, defendant makes several arguments. First, defendant contends that plaintiff's condition did not substantially limit her ability to engage in a "major life activity." Second, defendant maintains that its medical plan exclusion is not disability-based and, therefore, is lawful. Finally, defendant argues that it is entitled to summary judgment because the infertility exclusion in its medical plan is immune from ADA challenge by virtue of ADA Section 501(c)(3).

### A. Major Life Activity

■ In order for the plaintiff to state a claim under the ADA, she must have a disability. Disability is defined as a "physical or mental impairment that substantially limits one or more of the major life activities...." 42 U.S.C. § 12102(2). An ADA plaintiff must therefore satisfy two requirements: (1) plaintiff must have an impairment; and (2) the impairment must interfere with a major life activity.

### 1. Impairment

For purposes of the summary judgment motion, the defendant concedes that the plaintiff has created an issue of material fact as to whether she had a "physical impairment" within the meaning of the ADA.

### 2. Major Life Activity

Plaintiff contends that she is significantly restricted in the major life activities of repro-

duction and "caring for others." (Krauel Dep. 10–11, 44–45, 72–73). The ADA does not explicitly define "major life activities" in its provisions. However, ADA regulations identify a list of major life activities. The ADA regulations, as promulgated by the EEOC, state that, "[m]ajor life activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.1.

Although the use of the phrase "such as" indicates that the EEOC did not intend for the list to be exclusive, it is illustrative of the types of activities which the EEOC would consider to be "major life activities." The activities of reproduction and caring for others differ from the illustrative list of major life activities provided in the ADA regulations in at least 2 significant ways. First, the activities of reproduction and "caring for others," unlike the EEOC's list of activities, are lifestyle choices.[1] Second, reproduction and "caring for others" are not activities which are engaged in with the same degree of frequency as the listed activities. *Zatarain v. WDSU–Television, Inc.*, 881 F.Supp. 240, 243 (E.D.La.1995). As the court in *Zatarain* explained:

[F]inding "reproduction" to be a "major life activity" would be inconsistent with the illustrative list of major life activities provided in the ADA regulations. Reproduction is not an activity engaged in with the same degree of frequency as the listed activities of walking, seeing, speaking, breathing, learning, and working. (citations omitted). A person is required to walk, see, learn, speak, breath, and work throughout the day, day in and day out. However, a person is not called upon to reproduce throughout the day, every day. This Court cannot reasonably infer that reproduction is a "major life activity" based on an analysis of the illustrative list of activities in the regulation. Treating reproduction as a major life activity under the ADA would be a conscious expansion

---

**1.** Some people choose not to have children, but all people care for themselves, perform manual tasks, walk, see, hear, speak, breathe, learn, and work, unless a handicap or illness prevents them from doing so.

of the law, which is beyond the provision of this Court.

*Id.* at 243.

However, even though defining reproduction and "caring for others" as major life activities would be inconsistent with the EEOC regulations, the legislative history of the ADA arguably lends support to the plaintiff's position. In discussing whether the ADA would apply to persons with AIDS, the House of Representative's report on the ADA stated: "a person infected with [HIV] is covered under the first prong of the definition of the term "disability" because of a substantial limitation to *procreation* and intimate sexual relationships." Legislative history, H.Rep. No. 101–485(II) p. 52, 101st Cong., 42, 2nd Sess. (1990), *reprinted in* 1990 U.S.C.A. 267, 324, 334.[2]

While the legislative history may provide some support for the argument that procreation was intended by Congress to constitute a major life activity, this court acknowledges that legislative history is often "highly unreliable" and "hazardous at best." *Board of Education of Westside Community Schools v. Mergens,* 496 U.S. 226, 242, 110 S.Ct. 2356, 2367–68, 110 L.Ed.2d 191 (1990). Reliance on this portion of the legislative history of the ADA "cannot form a reasonable basis on which to interpret the text of" the ADA. *Id.* at 243, 110 S.Ct. at 2368. The only thing that can clearly be taken from this part of the legislative history is that some members of the House of Representatives thought that procreation constituted a "major life activity" for an AIDS patient under the ADA.[3]

In addition to the legislative history of the ADA, plaintiffs rely on several cases to support the proposition that reproduction is a major life activity. *Pacourek v. Inland Steel Co.,* 858 F.Supp. 1393, 1404–05 (N.D.Ill.1994) found that reproduction was a major life activity based in significant part on reasoning

that is "circular." *Zatarain,* 881 F.Supp. at 243. The court, in *Pacourek,* found that reproduction was a major life activity because the reproductive system was included among the systems that can have an ADA impairment. *Pacourek,* 858 F.Supp. at 1404. This reasoning is suspect because it fails to recognize that "physical or mental impairment" and "major life activities" are separate and distinct components of the ADA's definition of "disability." *Zatarain,* 881 F.Supp. at 243. As the *Zatarain* court observed, such a "construction is faulty because it would allow [the plaintiff] to bootstrap a finding of substantial limitation of a major life activity on to a finding of an impairment." *Id.*

Plaintiff cites *Chapsky v. Baxter V. Mueuller Div.,* 1995 WL 103299 (N.D.Ill.1995), a sex and pregnancy discrimination case, where the court found that reproduction is a major life activity. *Id.* at *3. *Chapsky* relies on *Pacourek* for support. As a result, it is questionable for the same reasons as *Pacourek.* The plaintiff also relied on *McWright v. Alexander,* 982 F.2d 222, 226–27 (7th Cir. 1992). In *McWright* the court interpreted the Rehabilitation Act and found that sterility was a "handicap" under the Act. However, in *McWright* the defendant did not dispute that infertility was a handicap under the statute. *Id.* at 226. Furthermore, the regulations developed under the Rehabilitation Act specifically defined the protected class of handicapped individuals to include any person with a physiological disorder affecting the reproductive system. 29 C.F.R. § 1613.702(b)(1); *McWright,* 982 F.2d at 227.

■ Finally, plaintiff cites *Doe v. Kohn Nast & Graf, P.C.,* 862 F.Supp. 1310 (E.D.Pa.1994). *Doe* found that reproduction was a major life activity under the ADA for a person infected with HIV by relying on Congress' use of the broad terms of "life"

---

**2.** The defendant attempts to limit this interpretation of the legislative history by arguing that Congress' use of the term "reproduction," in the context of HIV and AIDS, is really a euphemism for sex. (D. Reply p. 5). Although this argument may have credibility in other parts of the legislative history, it is not applicable to the quotation cited above. The conjunction "and" between "procreation" and "intimate sexual relations" indicates that procreation and sex were consid-

ered separate and independent major life activities in this section of the legislative history.

**3.** AIDS can be distinguished from infertility because it can limit many of the major life activities listed in the EEOC regulations—caring for oneself, performing manual tasks, walking, breathing, learning, and working.

and "major life activities." *Doe*, 862 F.Supp. at 1320. Although the terms "life" and "major life activities" are broad, the EEOC regulations on this provision of the ADA, as discussed earlier, necessitate a finding that "procreation" and "caring for others" are not "major life activities" under the statute. *See Department of Treasury, I.R.S. v. FLRA*, 494 U.S. 922, 931–33, 110 S.Ct. 1623, 1629, 108 L.Ed.2d 914 (1990) (holding that when an agency is charged with administering a statute, part of the authority it receives is the power to give reasonable content to the statute's textual ambiguities). The EEOC's interpretation indicates that "major life activities" should not be construed to include activities such as "procreation" and "caring for others." In interpreting a statute, a reviewing court must defer to the agency's interpretation of an ambiguous statute if that construction is reasonable. *Arkansas AFL–CIO v. F.C.C.*, 11 F.3d 1430, 1441 (8th Cir. 1993); *Independent Com. Bankers v. Fed. Reserve System*, 838 F.2d 969, 974 (8th Cir. 1988) (holding that even in considering a purely legal issue, a court should grant great deference to reasonable interpretation of statutes by agencies charged with administering those statutes). The EEOC's interpretation is reasonable.

■ In sum, based on the foregoing analysis, particularly the EEOC's interpretation of the ADA and the reasoning of the court in *Zatarain v. WDSU–Television, Inc.*, 881 F.Supp. 240, 243 (E.D.La.1995), this Court finds that "procreation" and "caring for others" are not cognizable "major life activities" within the meaning of § 12102(2).

4. For example, the Plan's infertility exclusion applies to infertility created by both ovarian cancer, a disability, and infertility that is caused by age, a condition which is not recognized as a disability.

5. The EEOC Interim Enforcement Guidance provides further clarification on what type of benefits plans should be considered disability-based. "A term or provision is 'disability-based' if it singles out a particular disability (e.g., deafness . . . .), a discrete group of disabilities (e.g., cancers), or disability in general (e.g., non-coverage of all conditions that substantially limit a major life activity)." EEOC Interim Enforce-

### B. Disability Based Medical Plan

■ Health-related insurance plan distinctions do not necessarily discriminate on the basis of a disability even though the distinctions may adversely affect a person with a disability. "Insurance distinctions that are not based on disability, and that are applied equally to all insured employees, do not discriminate on the basis of disability and so do not violate the ADA." EEOC Interim Enforcement Guidance at 79. Thus, insurance distinctions which apply to both individuals with disabilities and non-disabled individuals are lawful. The EEOC Interim Enforcement Guidance provides:

> [Broad benefit plan distinctions] which apply to the treatment of a multitude of dissimilar conditions and which constrain individuals both with and without disabilities, are not distinctions based on disability. Consequently, although such distinctions may have greater impact on certain individuals with disabilities, they do not intentionally discriminate on the basis of disability and do not violate the ADA.

*Id.*

The Plan's infertility exclusion challenged by the plaintiff is not a distinction based on disability. It applies to certain individuals who have disabilities. However, it also applies to individuals who do not have disabilities.[4] Under the plan, both types of individuals are denied infertility treatment coverage.

Because the infertility exclusion at issue affects the disabled and non-disabled equally, the Court finds that it is not a disability-based distinction and does not violate the ADA.[5]

ment Guidance at 80. "[B]road distinctions, which apply to the treatment of a multitude of dissimilar conditions and which constrain individuals both with and without disabilities, are not distinctions based on disability. [EEOC cites the example of health insurance plans which provide fewer benefits for 'eye care' than for other physical conditions] Consequently, although such distinctions may have a greater impact on certain individuals with disabilities, they do not intentionally discriminate on the basis of disability and do not violate the ADA." *Id.* at 79–80.

## C. Safe Harbor of 501(c)(3)

As previously indicated, section 12201(c)(3) is an insurance safe harbor that provides:

Subchapters I through III of this chapter and title IV of this Act shall not be construed to prohibit or restrict—

(3) a person or organization covered by this Act from establishing, sponsoring, observing or administering the terms of a bona fide benefit plan that is not subject to state laws that regulate insurance.

Paragraphs ... (3) shall not be used as a subterfuge to evade the purposes of subchapters I and III of this chapter.

Thus, to qualify for the protection of section 501(c)(3), the Plan's infertility exclusion must: (1) be part of a bona fide ERISA medical benefit plan that is not subject to state law and (2) it must not be a "subterfuge."

### 1. Infertility Exclusion as a Term of a Bona Fide ERISA Medical Benefit Plan that is not Subject to State Insurance Law

■ Defendant's Healthcare Preferred Plan is a bona fide plan because it exists, pays benefits, and has been communicated to covered employees. (Def. S.F. ¶ 24). *Public Employees Retirement System of Ohio v. Betts,* 492 U.S. 158, 165, 109 S.Ct. 2854, 2860, 106 L.Ed.2d 134 (1989); EEOC Interim Guidance at 82 ("If the health insurance plan is self-insured, the respondent will only be required to prove that the health insurance plan is bona fide in that it exists and pays benefits, and that its terms have been accurately communicated to covered employees."). Plaintiff does not contest this point. (P. Reply Brief, p. 20 n. 1). Plaintiff also does not dispute that the Plan "is not subject to any state law that regulates insurance." (P. Brief, p. 14). The Plan is a self-insured benefits plan which is regulated by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1002(1), (3). As such, any potentially applicable state law is preempted by ERISA and thereby rendered inapplicable to the Plan. *See* 29 U.S.C. § 1144(a); *Metropolitan Life Insurance Co. v. Massachusetts,* 471 U.S. 724, 747, 105 S.Ct. 2380, 2393, 85 L.Ed.2d 728 (1985).

Thus, the first prerequisite for qualifying under the safe harbor provisions of section 501(c)(3), that the infertility exclusion under the Plan is a term of a bona fide ERISA medical benefit plan that is not subject to state insurance law, has been met.

### 2. Health Insurance Plan is a Subterfuge

■ According to the EEOC, disability-based insurance distinctions that are a "subterfuge" intentionally discriminate on the basis of a disability, thereby violating the ADA. EEOC Interim Guidance p. 80. The defendants have the burden of proving that the challenged disability-based distinction is not being used as a subterfuge to evade the purposes of the ADA. *Id.* at 81.

The EEOC has further explained the meaning of "subterfuge":

"Subterfuge" refers to disability-based disparate treatment that is not justified by the risks or costs associated with the disability. Whether a particular challenged disability-based insurance distinction is being used as a subterfuge will be determined on a case by case basis, considering the totality of the circumstances.

*Id.* at 82. The EEOC has delineated a non-exclusive list of potential justifications that a defendant may use to prove that the disability-based distinction is not a subterfuge. The EEOC states that this may be done by one of the following:

1. The defendant may prove that it has not engaged in the disability-based disparate treatment alleged.

2. The defendant may prove that the disparate treatment is justified by legitimate actuarial data, or by actual or reasonably anticipated experience, and that conditions with comparable actuarial data and/or experience are treated in the same fashion.

3. The defendant may prove that the disparate treatment is necessary to ensure that the challenged health insurance plan satisfies the commonly accepted or legally required standards for the fiscal soundness of such an insurance plan.

4. The defendant may prove that the challenged insurance practice or activi-

ty is necessary to prevent the occurrence of an unacceptable change either in the coverage of the health insurance plan, or in the premiums charged for the health insurance plan.

5. Where the charging party is challenging the defendant's denial of coverage for a disability-specific treatment, the defendant may prove that this treatment does not provide any benefit.

EEOC Interim Guidelines pp. 82–82.

Defendant suggests that "subterfuge" should be interpreted under the ADA as having the same meaning as was originally accorded that term under the Age Discrimination in Employment Act (ADEA). In *Ohio Public Employees Retirement System v. Betts*, 492 U.S. 158, 109 S.Ct. 2854, 106 L.Ed.2d 134 (1989), the court held that a pre-ADEA benefit plan could not be subterfuge, and that, since the ADEA did not expressly apply to fringe benefits, subterfuge required a showing of the employer's specific intent to discriminate in some non-fringe aspect of the employment relationship. *Id.* at 180–82, 109 S.Ct. at 2868–69.

However, the EEOC Interim Guidance states that "both the language of the ADA, expressly covering 'fringe benefits,' and the Act's legislative history, rejecting the concept of a 'safe harbor' for pre-ADA plans, make plain congressional intent that the *Betts* approach not be applied in the context of the ADA." EEOC Interim Guidance at 81 n. 10. The EEOC's interpretation of the statute must be given deference unless it is determined that this interpretation is not reasonable. *Arkansas AFL–CIO*, 11 F.3d at 1441.

On June 23, 1989, the Supreme Court decided *Betts* and defined "subterfuge" as a "scheme" used to discriminate "in some non-fringe-benefit aspect of her employment relation." *Betts*, 492 U.S. at 181, 109 S.Ct. at 2868. Thirteen months later, on July 26, 1990, Congress enacted the ADA and used the same subterfuge language interpreted in *Betts* in § 501(c). *See* Pub.L. 101–336, 104 Stat. 327. On October 16, 1990, Congress amended the ADEA by enacting the Older Workers Benefit Protection Act, Pub.L. No. 101–433, 104 Stat. 978. This amendment deleted "subterfuge" and replaced it with other

language. *See* 29 U.S.C. § 623(f)(2). However, Congress did not amend ADA § 501(c) to delete "subterfuge."

In *Lorillard v. Pons*, 434 U.S. 575, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978), the Supreme Court stated:

Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change. So too, where, as here, Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute.

*Id.* at 580–81, 98 S.Ct. at 870–71; *Pierce v. Underwood*, 487 U.S. 552, 567, 108 S.Ct. 2541, 2551, 101 L.Ed.2d 490 (1988) ("Quite obviously, reenacting precisely the same language [in a law] would be a strange way to make a change."). Accordingly, given that Congress is presumed to know of the Supreme Court's interpretation of "subterfuge" in *Betts* when it enacted the ADA, it is logical that Congress intended to adopt the meaning of subterfuge as interpreted in *Betts*.

In response to this, plaintiff cites legislative history which specifically states that the term " 'subterfuge' as used in the ADA, should not be interpreted in the manner in which the Supreme Court interpreted the term in [*Betts* ]. 136 Cong.Rec. § 9684, 9697; Legislative History of Pub.L. No. 101–433, 104 Stat. 978 ("The provision regarding subterfuge in section 501(c) should not be undermined by a restrictive reading of the term 'subterfuge' as the Supreme Court did in *Betts*.").

■ However, the legislative history, as previously discussed, is often unreliable and the EEOC's interpretive statements are not given controlling weight if they are not reasonable. *See Arkansas AFL–CIO*, 11 F.3d at 1441. Congress knew of the Supreme Court's interpretation of subterfuge when it enacted the ADA, yet it still used the term. Given the Supreme Court's rule for interpreting statutes as stated in *Lorillard*, "subterfuge", as used in the ADA, should be given the meaning adopted by the Court in

*Betts.* As a result, the defendant's plan is a "subterfuge" only if it is used to discriminate "in some non-fringe-benefit aspect of the employment relation."[6] *Betts,* 492 U.S. at 181, 109 S.Ct. at 2868.

Plaintiff concedes that she has suffered no employment discrimination outside the Plan. (Def. S.F. ¶ 8). Consequently, plaintiff cannot prove the Plan was a subterfuge. As a result, section 501(c)(3) provides a safe harbor for the infertility exclusion.

### D. Conclusion

Summary judgment must be granted for the defendant on Count I because infertility does not come within the definition of a disability under the ADA, the Plan's infertility exclusion is not disability-based, and the infertility exclusion in the Plan is immune from an ADA challenge by virtue of ADA section 501(c)(3).

## IV. PREGNANCY DISCRIMINATION ACT (COUNT II)

The Civil Rights Act of 1964 (Title VII) provides as follows: It shall be an unlawful employment practice for an employer—

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex....

42 U.S.C. § 2000e–2.

The Pregnancy Discrimination Act (PDA), 42 U.S.C. § 2000e(k), enacted in 1978, amended Title VII to provide as follows:

> The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs....

In support of its motion for summary judgment, defendant makes two arguments. First, defendant argues that the plaintiff does not state a cognizable disparate treatment cause of action because the treatment of infertility is not the treatment of a medical condition related to pregnancy or childbirth as defined by the ADA. Secondly, the defendant argues that the plaintiff has failed to establish a prima facie case of disparate impact under Title VII.

### A. Disparate Treatment Analysis

In a disparate treatment claim, "[t]he employer ... treats some people less favorably than others because of their ... sex." *International Brotherhood of Teamsters v. U.S.,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). "[L]iability depends on whether the protected trait (under the PDA, pregnancy, childbirth, and related medical conditions) actually motivated the employer's decision." *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 610, 113 S.Ct. 1701, 1706, 123 L.Ed.2d 338 (1993). "Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment." *Teamsters,* 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15.

Defendant's health care plan excludes coverage for the treatment of infertility. Therefore, in this case, the issue becomes whether the treatment of infertility is the treatment of a medical condition "related" to pregnancy or childbirth.

The Court's analysis must begin with the plain language of the statute. *Amoco Production Co. v. Village of Gambell, Alaska,* 480 U.S. 531, 552–53, 107 S.Ct. 1396, 1407–08, 94 L.Ed.2d 542 (1987). Under its ordinary meaning, related medical conditions is a broad phrase which could conceivably encompass the treatment of infertility. *See Pacourek v. Inland Steel Co.,* 858 F.Supp. 1393, 1402 (N.D.Ill.1994) (" 'Related' is a generous choice of wording, suggesting that interpretation should favor inclusion rather

---

**6.** The defendant's Healthcare Preferred Plan was instituted prior to the adoption of the ADA. (Allyn Affid., ¶¶ 2, 7). As such, according to the Supreme Court's reasoning in *Betts,* subterfuge required a showing of the employer's specific intent to discriminate in some non-fringe aspect of the employment relationship. *Betts,* 492 U.S. at 180–82, 109 S.Ct. at 2868–69.

than exclusion in the close cases."). However, for reasons discussed below, this court finds that infertility is not encompassed by the phrase "related medical conditions."

■ The PDA is a remedial statute, and as such, it should be liberally construed. *Monell v. N.Y.C. Dept. of Social Services,* 436 U.S. 658, 684, 98 S.Ct. 2018, 2032–33, 56 L.Ed.2d 611 (1978). Nevertheless, the word "relates" should not be interpreted to be without bounds. *See New York State Conference of Blue Cross and Blue Shield Plans v. Travelers Insurance Company,* — U.S. —, —, 115 S.Ct. 1671, 1682, 131 L.Ed.2d 695 (1995) (holding that the phrase "relates to" should be interpreted to limit the breadth of ERISA).

■ Under the rules of statutory construction, "when a general term follows a specific one, the general term should be understood as a reference to subjects akin to the one with the specific enumeration." *Norfolk & Western v. American Train Dispatchers,* 499 U.S. 117, 129, 111 S.Ct. 1156, 1163, 113 L.Ed.2d 95 (1991). This rule does not control, however, "when the whole context dictates a different conclusion." *Id.* Applying this rule of statutory construction to the present case, "related medical conditions," a general term, should be understood as a reference to "pregnancy" and "childbirth," specific terms, unless the context of the PDA dictates otherwise. Pregnancy and childbirth both refer to conditions which occur after conception. On the other hand, infertility, by definition, occurs prior to conception, and is not analogous to the previous terms.

In addition, the context of the PDA does not require that the phrase "related medical conditions" include infertility. The plain language of the PDA does not indicate that "related medical conditions" should be interpreted broader than the context of "pregnancy" and "childbirth." Furthermore, the legislative history and the EEOC guidelines do not make any reference to infertility treatments. *See* Legislative History of the Pregnancy Discrimination Act of 1978, at 1–212 (1978) (Prepared for the Committee on Labor and Human Resources, United States Senate, 96th Cong. 2d Sess. Committee Print); 29 C.F.R. § 1604 *et seq.* The conten-

tion that the PDA's coverage should be broader than "pregnancy" and "childbirth" since it is a remedial statute is not sufficient reason to override an accepted rule of statutory construction.

The Eighth Circuit found that the PDA was created for two reasons. First, it was intended to "require employers who provided disability benefits to their employees to extend such benefits to women who are unable to work due to pregnancy-related conditions." *Carney v. Martin Luther Home, Inc.,* 824 F.2d 643, 646 (8th Cir.1987). Second, the PDA was enacted "to prevent the *differential* treatment of women in all aspects of employment based on the condition of pregnancy." *Id.* (emphasis added).

In accord with the Eighth Circuit, several cases emphasize that the PDA was intended to prohibit the *differential* treatment of women based on pregnancy, childbirth, or related medical conditions. In *Paseur v. W.W. Grainger, Inc.,* 52 Fair Empl.Prac. Cases (BNA) 789 (N.D.Ill.1989) the court stated:

> [T]he PDA was merely intended to establish that the prohibition against discrimination on the basis of pregnancy, childbirth, or related medical conditions was included in Title VII's prohibition against *sex* discrimination. There is nothing inherently sex-related about child care, however—either parent may care for a child.

*Id.* at 790. Likewise, in *Fleming v. Ayers & Associates,* 948 F.2d 993 (6th Cir.1991) the court stated:

> It seems to us obvious that the reference in the Act to 'women affected by . . . related medical conditions' refers to related medical conditions of the pregnant woman, not conditions of the resulting offspring. Both men and women are 'affected by' medical conditions of the resulting offspring.

*Id.* at 997. Infertility, unlike pregnancy or childbirth, is not a medical condition that is sex-related because both men and women can be infertile. As a result, infertility is not sufficiently analogous to the specific terms in the PDA and is not come within the protection of the PDA.

The cases cited by the plaintiff are not persuasive. *International Union, UAW v. Johnson Controls,* 499 U.S. 187, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991), held that discrimination on the basis of potential pregnancy was discrimination on the basis of sex under the PDA. *Id.* at 197–98, 111 S.Ct. at 1203. Again, only women can become "potentially pregnant," and therefore, it is a medical condition that is sex-related, unlike infertility. Similarly, *Turic v. Holland Hospitality, Inc.,* 849 F.Supp. 544, 549 (W.D.Mich.1994) held that th-. PDA's use of the term "related medical conditions" encompassed a woman's right to have an abortion. Only women can have abortions. In addition, abortions, unlike infertility, occur only after a woman has become pregnant. Moreover, the EEOC guidelines specifically stated that abortions are covered under the PDA. Appendix 29 C.F.R. 1604 (1986). *See also* H.R.Conf.Rep. No. 95–1786, 95th Cong., 2d Sess. 4, *reprinted in* 1978 U.S.C.C.A.N. 4765–66 (stating that "related medical conditions" covers women who choose to terminate their pregnancies).

Finally, the plaintiff relies on *Pacourek v. Inland Steel Co.,* 858 F.Supp. 1393 (N.D.Ill. 1994). The *Pacourek* court held that a medical condition that prevents a woman from becoming pregnant naturally is a pregnancy-related medical condition for the purposes of the PDA. *Id.* at 1403–04. In reaching this conclusion, the court relied extensively on the legislative history of the PDA. However, the legislative history cited by that court did not provide any direct evidence that Congress intended infertility to be covered by the PDA.

The *Pacourek* court also failed to recognize the distinction between childbirth and pregnancy, conditions which are not gender-neutral and infertility, a condition which is gender neutral. *Id.* at 1403. In fact, the court did not squarely address this distinction because the defendant did not specifically contend that its policy was one of gender-neutral discrimination against infertile workers. *Id.*

Plaintiffs also argue that the legislative history of the PDA provides support for an expansive reading of the PDA. In enacting the PDA, Congress stated:

In using the broad phrase "women affected by pregnancy, childbirth and related medical conditions," the bill makes clear that its protection extends to the whole range of matters concerning the child-bearing process.

H.R.Rep. No. 95–948, 95th Cong., 2d Sess. 5, *reprinted in* 5 U.S.C.C.A.N. 4749, 4753 (1978).

However, as previously indicated, legislative history is often unreliable. *Board of Education of Westside Community Schools v. Mergens,* 496 U.S. 226, 242, 110 S.Ct. 2356, 2367–68, 110 L.Ed.2d 191 (1990). Moreover, in this case, the legislative history does not clearly support the plaintiff's position. The above statement only indicates that the PDA's protection extends to matters concerning the *child-bearing* process. The process of child bearing occurs after conception. Infertility treatments, which occur prior to conception, would normally not be included in the "child-bearing" process.

In sum, this court relies on accepted rules of statutory construction and the fact that infertility is not a sex-related medical condition while pregnancy and childbirth are sex-related, in finding that the treatment of infertility is not the treatment of a medical condition related to pregnancy or childbirth. As a result, the defendant's motion for summary judgment on the plaintiff's disparate treatment claim under the PDA should be granted.

B. Disparate Impact Analysis

 Title VII prohibits employment practices which may be fair in form or facially neutral that are discriminatory in operation. *Connecticut v. Teal,* 457 U.S. 440, 446, 102 S.Ct. 2525, 2530, 73 L.Ed.2d 130 (1982). To establish a prima facie case of adverse impact, a plaintiff must show that an employer uses " 'employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another,' without adequate justification." *Houghton v. SIPCO, Inc.,* 38 F.3d 953, 958 (8th Cir.1994) (quoting *International Brotherhood of Teamsters v. U.S.,* 431 U.S. 324, 336, 97 S.Ct. 1843, 1854–55, 52

L.Ed.2d 396 (1977)). In the summary judgment context, the plaintiff must offer evidence of each prima facie element in order to justify a trial. *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382–83 (8th Cir.1994). In the present case, to make a prima facie case of disparate impact, the plaintiff must demonstrate that the defendant's policy of excluding infertility benefits from its insurance plan has a significantly disparate impact on female employees. *Bradley v. Pizzaco of Nebraska, Inc.*, 939 F.2d 610, 612 (8th Cir. 1991).

 Normally, the plaintiff must offer "statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion" of benefits because they are women. *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 995, 108 S.Ct. 2777, 2789, 101 L.Ed.2d 827 (1988); *Leidig v. Honeywell, Inc.*, 850 F.Supp. 796, 802 (D.Minn.1994) (stating that the significant discriminatory impact will normally be made with the use of statistics); *Webb v. Derwinski*, 868 F.Supp. 1184, 1190 (E.D.Mo. 1994) (same). "Statistical disparities must be sufficiently substantial that they raise … an inference of causation." *Watson*, 487 U.S. at 995, 108 S.Ct. at 2789.

In resistance to the defendant's motion for summary judgment, plaintiff relies on two arguments. First, plaintiff argues that infertility treatments have a greater impact on women because they are the ones who are required to undergo a majority of the treatment, even if the male is the cause of the infertility. (PLAINTIFF'S STATEMENT OF FACTS IN RESISTANCE at 1). Second, plaintiff states that infertility has a greater impact on women because they endure the costs of the infertility treatments. (PLAINTIFF'S STATEMENT OF FACTS IN RESISTANCE at 1).

 Plaintiff's first argument is not relevant because the fact that infertility treatments adversely impact women medically has no bearing on whether defendant's insurance exclusion disproportionately impacts women under Title VII. Title VII is concerned only with discrimination with respect to "compensation, terms, conditions, or privileges *of employment*." 42 U.S.C. § 2000e–2 (emphasis added). It is not concerned with the disproportionate medical impact that infertility treatments may have on men or women because this is not a consequence of employment. Rather, it is a consequence of medical techniques and practices. As a result, Title VII is not applicable to the contention that the infertility exclusion has a greater impact on women because they are the ones who are required to undergo a majority of the treatment.

The plaintiff's second argument fails because the plaintiff has not provided evidence that female participants in plaintiff's medical plan and their dependent spouses incurred disproportionately more of the costs of infertility treatments than did male plan participants and their dependent spouses. Plaintiff's evidence of the disparate impact caused by the Plan's infertility exclusion is probably sufficient to demonstrate a discriminatory impact between male and female employees. *Bradley v. Pizzaco of Nebraska, Inc.*, 939 F.2d 610, 612–14 (8th Cir.1991) (holding that medical evidence and a statistical study by the military was sufficient evidence to prove a discriminatory impact). However, the plaintiffs failed to analyze the discriminatory impact of the infertility exclusion on the spouses of the male employees.

 Health insurance and fringe benefits are "compensation, terms, conditions, or privileges of employment" under Title VII. *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 682, 103 S.Ct. 2622, 2630, 77 L.Ed.2d 89 (1983). The fringe benefits received by an employee include those received from the coverage of a dependent spouse. *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 103 S.Ct. 2622, 77 L.Ed.2d 89 (1983) held that the provision of benefits to the spouses of male employees could be considered in determining if discrimination existed in an insurance plan. *Id.* at 682–85, 103 S.Ct. at 2630–32. In *Newport News*, the denial of insurance coverage to the male spouse for his dependant female spouse was a violation of the PDA. *Id.*

 As a result of the holding in *Newport News* and the plain language of Title VII, the dependents under an insurance plan

should be considered when determining the discriminatory nature of an insurance plan.[7] *See Id.* at 682–83, 103 S.Ct. at 2630–31 (providing that the discrimination analysis for employee insurance benefits should include coverage of the dependents of the employees). Male plan participants who have dependent coverage for their female spouses, would suffer the same medical and financial impact as the female plan participants as a result of the Plan's infertility exclusion. The plaintiff has failed to produce evidence that female participants in the HealthCare Preferred Plan and their spouse dependents incurred disproportionately more costs as a result of the infertility exclusion than did the male Plan participants and their spouse dependents. As a result, the plaintiffs have not established a prima facie case of disparate impact.[8]

## C. Conclusion

Plaintiff's disparate treatment claim fails because the treatment of infertility is not the treatment of a medical condition related to pregnancy or childbirth. Plaintiff's disparate impact claim fails because the plaintiff has not established a prima facie case of disparate impact. Therefore, summary judgment must be granted for the defendant on Count II.

## V. ORDER FOR JUDGMENT

Based on the foregoing, defendant's motion for summary judgment on Count I and Count II is granted. The Clerk shall enter judgment for the defendant.

---

7. Plaintiffs argue that *Newport News* is not applicable because it involved a disparate treatment claim rather than a disparate impact claim. While this is true, the reasoning of *Newport News* and the plain language of Title VII indicate that a disparate impact analysis on employee benefits should include *all* benefits provided to an employee. Therefore, a disparate impact analysis may include an analysis of the benefits an employee's dependents receives, as well as the benefits the employee receives.

8. Defendant argues that the disparate impact theory of liability is not applicable in an insurance context. While this Court does not directly

decide this issue because summary judgment is granted on other grounds, the Court does note that neither *City of Los Angeles v. Manhart,* 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978) nor any other cases directly hold that the disparate impact theory of liability is not applicable in insurance contexts. *See Wambheim v. J.C. Penney Comp., Inc.,* 705 F.2d 1492 (9th Cir.1983) (holding that a disparate impact analysis could be applied to a determination of whether an employer's insurance plan discriminated with respect to compensation, terms, conditions or privileges of employment).