927 F.Supp. 1226 (1996)
Diane PIANTANIDA, Plaintiff,
v.
WYMAN CENTER, INC., a/k/a Kiwanis Camp Wyman, Defendant.
No. 4:95CV668SNL.
United States District Court, E.D. Missouri, Eastern Division.
June 4, 1996.
*1227 *1228 *1229 *1230 Jerome J. Dobson, Jonathan C. Berns, Weinhaus and Dobson, St. Louis, MO, for plaintiff.
Robert A. Kaiser, Daniel K. O'Toole, David W. Welch, Armstrong and Teasdale, St. Louis, MO, for defendant.

MEMORANDUM
LIMBAUGH, District Judge.
Plaintiff has filed a two-count complaint alleging that she was demoted and constructively discharged unlawfully on the basis of sex, particularly her pregnancy.[1] Specifically, plaintiff brings this action pursuant to Title VII, 42 U.S.C. § 2000e(k), and the Missouri Human Rights Act (MHRA), § 213.010 R.S.Mo. This matter is before the Court on the defendant's motion for summary judgment (# 12), filed March 11, 1996. Extensive responsive pleadings have been filed. This cause of action is set for trial on the Court's trial docket of June 10, 1996.
Courts have repeatedly recognized that summary judgment is a harsh remedy that should be granted only when the moving party has established his right to judgment with such clarity as not to give rise to controversy. New England Mut. Life Ins. Co. v. Null, 554 F.2d 896, 901 (8th Cir.1977). Summary judgment motions, however, "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." City of Mt. Pleasant v. Associated Elec. Coop. Inc., 838 F.2d 268, 273 (8th Cir.1988).
Pursuant to Fed.R.Civ.P. 56(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 467, 82 S.Ct. 486, 487, 7 L.Ed.2d 458 (1962). The burden is on the moving party. Mt. Pleasant, 838 F.2d at 273. After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Catrett, *1231 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).
In passing on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. Buller v. Buechler, 706 F.2d 844, 846 (8th Cir.1983). The court is required to resolve all conflicts of evidence in favor of the nonmoving party. Robert Johnson Grain Co. v. Chem. Interchange Co., 541 F.2d 207, 210 (8th Cir.1976). With these principles in mind, the Court turns to an examination of the facts.
Defendant Wyman Center is a not-for-profit charitable organization whose purpose is to provide a "camping experience" to disadvantaged inner-city youth. At all relevant times, defendant's Executive Director was David Hilliard; defendant's Director of Development was Linda Waugh; and defendant's Director of Administration and Finance was Lorrie Goecker. Ms. Waugh was responsible for the overall fundraising for the Wyman Center. Her primary duties included organizing annual charitable appeals, working with the Kiwanis Clubs in their fundraising efforts on behalf of defendant, and preparing grant proposals for corporations and private foundations. Ms. Goecker's primary duties included responsibility for accounting, bookkeeping, and the secretarial pool.
On or about June 15, 1992 plaintiff began working for defendant as the Executive Assistant to the Development Director; i.e. as Ms. Waugh's administrative assistant. The third member of the Development Department staff was Rose Duckett, the Development Department Secretary. Following a routine initial two-month probationary period, plaintiff worked for defendant as Ms. Waugh's administrative assistant for approximately another seven (7) months.
As Ms. Waugh's assistant, plaintiff's primary duty was to assist Ms. Waugh as to the coordination and management of fundraising activities. This consisted of assisting in the drafting of grant proposals, coordinating volunteers who worked in the Development Department, managing donor lists, acknowledging donations, and insuring that various deadlines for certain activities were met. Although plaintiff's responsibilities included exercising some discretion as to the allocation of work and supervision of Ms. Duckett, plaintiff was considered also a member of the secretarial pool and was subject to receiving assignments from Ms. Goecker to relieve another staff member's workload, or could request assistance from Ms. Goecker as to her own workload. Since Wyman Center is a charitable organization, it is largely dependent on donations for its existence. In this regard, it is defendant's policy to timely acknowledge receipt of a contribution, as quickly as forty-eight (48) hours of receipt. Normally, a contribution would be logged in, then given to the Executive Assistant (i.e. the plaintiff) to mail out an acknowledgement. Some contributions would receive a "formletter" acknowledgement; others would require a personal letter or revision of a "formletter" from Ms. Waugh and then this personalized acknowledgment would be sent out by the plaintiff. Deposition of Linda Waugh, pgs. 70-76; Deposition of Lorrie Goecker, pgs. 58-62; Affidavit of Plaintiff.
At the end of plaintiff's probationary period, Ms. Waugh completed a work performance evaluation of the plaintiff. This evaluation generally rates plaintiff's performance as largely satisfactory; however, specific weaknesses were observed:
* stay focused til completion
* stay current with day to day projects/complete projects, e.g. filing, gift imput
* meet deadlines
* advise D.D. (Development Director) if a problem arises
* be more ____ (word unintelligible) with phone coverage
Plaintiff's Exhibit 9; Defendant's Exhibit C.[2] Throughout the evaluation Ms. Waugh notes a need for the plaintiff to keep Ms. Waugh *1232 informed as to plaintiff's work progress on projects. This admonition is highlighted in the three (3) goals Ms. Waugh set out for the plaintiff over the next year: 1) Keep a list of things to do with deadlines so D.D. can see overall workload and priorities; 2) Increase communications w/DD to keep awareness up of what stages projects are in; and 3) Make time in schedule to organize drawers and keep organization in line. Plaintiff's Exhibit 9. Plaintiff signed off this evaluation as agreeing with the appraisal. Plaintiff's Exhibit 9. Following this evaluation, plaintiff was made a permanent non-probationary employee.
In addition to verbally reminding plaintiff of the need to timely complete projects and of approaching deadlines, Ms. Waugh distributed to plaintiff lists of assigned tasks and completion deadlines. Waugh Deposition, pgs. 75-79; Plaintiff's Deposition, Vol. I, pgs. 111-12; 140; Plaintiff's Exhibit 10. Plaintiff continued to experience difficulty in handling her workload in a timely manner and sought assistance on a regular basis. Plaintiff's Deposition, Vol. I, pg. 67. Ms. Waugh observed that plaintiff had a particular problem getting acknowledgements out in a timely manner and continued to impress upon her that this task was a priority. Waugh Deposition, pgs. 76-78. In February 1993, Ms. Waugh gave plaintiff a specific list of tasks that needed to be completed. Plaintiff's Exhibit 10. Under No. 5 the project listed is "acknowledgements" and "Dec." is noted; the list indicates that another support staff person "Julie" was assigned to handle these acknowledgements "ASAP"[3]. Plaintiff's Exhibit 10; Goecker Deposition, pg. 50. This project was assigned to Julie because the plaintiff requested extra help. Plaintiff's Deposition, Vol. I., pg. 100.
Ms. Waugh's concerns regarding plaintiff's ability to coordinate her workload and complete projects in a timely manner were expressed to Hilliard. Hilliard Deposition, pg. 45. On February 26, 1993 Waugh wrote a memo to Goecker, which in turn was distributed to Hilliard. Defendant's Exhibit D. This memo outlines specifically an incident involving the plaintiff in which she failed to timely complete a project, and was abrupt with Ms. Waugh when reminded of the need to complete the project. Defendant's Exhibit D; Plaintiff's Deposition, Vol. I, pg. 115. The project was eventually turned over to Ms. Duckett. Waugh wrote her observations of plaintiff's work habits as follows:
1. Diana is not able to handle/coordinate/meet all deadlines for a variety of projects.
2. Diana is not able to complete some projects on deadlines; and does not always let Waugh know where she is in project; consequently, Waugh will ask her how she is doing and when will it be finished. This may happen often if I need the project. Waugh has also deferred to Diana when setting deadlines; I realize that Diana is still learning but feel that she should know my work style and the pace of this office. Waugh has suggested a new project list and deadline sheet to facilitate matters.
3. Diana, when she is confronted about a project will sometimes respond in an abrupt manner and put the blame on the other person.
4. Diana does not seem to be in tandem with supervisor and her work style and most of the time when there is a deadline to meet, and we are under the gun. She does not want to do anything else and she had told me this and her body language speaks of this. Of course I give her projects anyway.
5. Diana has picked up her work pace; but there are times when she does things in her own time and does not keep Waugh up on project.
6. Diana has done very well with delegating to volunteers.
Defendant's Exhibit D. Unidentified handwritten comments (regarding Waugh's observations), dated "3/8" are on this memo.
On March 9, 1993 plaintiff tendered to defendant a written notice of her intent to take maternity leave. Plaintiff's Exhibit 11. She had previously told Waugh and Goecker about her pregnancy in October 1992. Plaintiff's Deposition, Vol. I, pg. 122. Plaintiff's testimony is inconsistent as to her discussions with defendant's personnel regarding *1233 her maternity leave. She testified that the only person she discussed her maternity leave with was Goecker, Plaintiff's Deposition, Vol. I., pgs. 123-24; however, she also testified that sometime in February 1993 she discussed with both Waugh and Goecker about who would take over her duties while on maternity leave and was told that Dorothy Beavens (a former employee of defendant) had been contacted to fill in temporarily for the plaintiff, Plaintiffs Deposition, Vol. I, pgs. 151-52.
In preparation of her maternity leave, plaintiff discussed with Rose Duckett her ongoing assignments. Duckett Deposition, pgs. 29-32; 35. On or about plaintiff's last day of work, she and Ms. Duckett created a list of projects that needed to be completed or were ongoing. Duckett Deposition, pgs. 29-31. This list was given to Ms. Waugh who expressed concern over the backlog of assignments, especially the acknowledgements. Duckett Deposition, pgs. 47-48. Dorothy Beavens also met with plaintiff sometime in early March to go over plaintiff's workload. Plaintiff's Deposition, Vol. II., pgs. 29-30.
Meanwhile, on March 10, 1993 Waugh gave to plaintiff a written "Office Action Checklist" requesting that plaintiff have all of the outstanding acknowledgements completed by March 15th. Plaintiff's Exhibit 13. Other than Waugh's handwriting on this checklist, plaintiff's handwriting is present. Plaintiff wrote "3/12 gave the letters to Linda to approve/update" and "Linda has letters to update 3/16" and "rec'd part 3/17" and finally, "still has Weedy letter back". The checklist does not state how many acknowledgements were outstanding as of March 10, 1993 or how long the acknowledgements had been outstanding (i.e. when the donations had originally been received by the defendant).
On March 22, 1993 plaintiff began her maternity leave.[4] For the first several days, Ms. Duckett worked on plaintiff's assignments, including acknowledgements. Duckett Deposition, pgs. 37-38. She did not recall any specific problems regarding the acknowledgments. Duckett Deposition, pg. 37. On or about March 25, 1993 Ms. Beavens relieved Ms. Duckett of plaintiff's assignments. Beavens Deposition, pg. 26. Ms. Beavens relieved Ms. Duckett of plaintiff's assignments because Ms. Duckett had asked for assistance so she could return to her regular duties. Duckett Deposition, pg. 40.
When Ms. Beavens began filling in for the plaintiff, she came into possession of a file folder full of acknowledgements along with the Office Action Checklist that Ms. Waugh had given the plaintiff on March 10th. Beavens Deposition, pgs. 33-35. Ms. Goecker directed Ms. Beavens to inform her as to how many acknowledgements she had to do. Beavens Deposition, pgs. 33-34. On March 31, 1993 Ms. Beavens indicated on the Office Action Checklist that she had done 87 acknowledgements. Beavens Deposition, pgs. 35-38. Ms. Beavens testified that although she could not recall specific dates she did recall that some of the acknowledgements were for donations outstanding at least two months. Beavens Deposition, pgs. 36, 38. Beavens completed the acknowledgements by putting them in chronological order from oldest to most recent; then, placing them into one of three categories: capital, operating, and foundation. Beavens Deposition, pg. 41. She testified that "[t]here were letters in the computer already to fit most of the gifts. They were done specifically for that reason. Linda had done them, and maybe Diana did them, you know, on her own, I don't know, but they were in the computer." Beavens Deposition, pg. 40. There is nothing in the record to indicate that either Ms. Duckett or Ms. Beavens had to wait on Ms. Waugh for a form letter before being able to send out the acknowledgements contained in the file folder.
*1234 When Ms. Beavens completed sending out the acknowledgements contained in the file folder, she returned the folder and the Office Action Checklist to Ms. Goecker. Beavens Deposition, pgs. 43-44. Ms. Beavens testified that she did not speak with Ms. Waugh directly regarding the 87 acknowledgements she had completed and noted on the Office Action Checklist. Beavens Deposition, pgs. 45-46. However, Ms. Goecker testified that Ms. Beavens did report to both she and Ms. Waugh that a large number of acknowledgements had not been completed by plaintiff in a timely manner prior to her taking maternity leave. Goecker Deposition, pg. 45.
Mr. Hilliard was informed of the acknowledgements done by Ms. Beavens while plaintiff was on maternity leave. Goecker Deposition, pgs. 64-65; Hilliard Deposition, pgs. 54-56. Two meetings with Mr. Hilliard took place regarding the discovery of tasks left uncompleted by the plaintiff prior to her taking maternity leave. At both meetings plaintiff's work habits were discussed among Hilliard, Goecker, and Waugh. Although Ms. Waugh had been aware of plaintiff's difficulty with keeping up with her workload, especially with the acknowledgements, she expressed surprise at the extent of plaintiff's backlog of work. Goecker Deposition, pgs. 45, 64; Hilliard Deposition, pgs. 63-64, 66, 69, 72. Restructuring the Development Department was discussed and in particular, reassigning plaintiff, upon her return from maternity leave, to a new position. Goecker Deposition, pgs. 64-65, 67-68; Hilliard Deposition, pgs. 80-84. Ms. Waugh drafted a new job description for the plaintiff. Hilliard Deposition, pgs. 85-86. The new position was for Development Department Secretary and plaintiff's new duties would be limited to general clerical duties; her independence, discretion, and autonomy would be reduced. Hilliard Deposition, pgs. 86-91; Waugh Deposition, pgs. 119-120; Plaintiffs Exhibit 19. This was considered to be an entry-level position with a salary of approximately $750.00/month. Hilliard Deposition, pgs. 85-86, 98-99. Upon plaintiff's return to work, it was contemplated that she would be on probation for two months and then subject to review. Waugh Deposition, pg. 114; Hilliard Deposition, pgs. 98-99; Plaintiff's Exhibit 20.
On April 20, 1993 Waugh telephoned plaintiff to inform her that upon her return from maternity leave she would be assigned the position of Department Secretary at a salary of $750.00/month. Plaintiff's Deposition, Vol. I., pgs. 80, 83, 87; Goecker Deposition, pgs. 42-44. Although Ms. Goecker was present when Ms. Waugh telephoned plaintiff, there is a dispute as to whether or not plaintiff also spoke with Ms. Goecker. Plaintiff's Deposition, Vol. I., pgs. 86-88; Goecker Deposition, pgs. 42-44. Ms. Waugh prepared a memorandum in connection with this telephone conversation. Plaintiff's Exhibit 21. A letter, dated April 20, 1993, was sent to the plaintiff confirming the telephone call of the same date. Plaintiff's Exhibit 18. On April 22, 1993 plaintiff telephoned Mr. Hilliard to discuss the reassignment. Ms. Waugh prepared a memorandum in connection with this telephone call. Plaintiff's Exhibit 20. On May 3, 1993 Ms. Waugh sent to plaintiff a job description for her new position as Development Secretary. Plaintiff's Exhibit 19.
Plaintiff was scheduled to return to work on June 1, 1993. Plaintiff's Deposition, Vol. II., pg. 117. On May 12, 1993 plaintiff had her obstetrician certify to defendant that plaintiff was able to return to work on June 1, 1993. Plaintiff's Deposition, Vol. II, pgs. 116-17. On May 24, 1993 plaintiff wrote Ms. Goecker informing her that plaintiff would not be returning to work to assume the Development Secretary position "because the salary offering will not cover my living expenses." Plaintiff's Exhibit 22.
Plaintiff contends that defendant discriminated against her on the basis that she was a "new mother" and that the defendant constructively discharged her by offering her a "demotion" at an approximately 50% reduction in salary. Defendant contends that plaintiff was not discriminated against on the basis of her sex, her pregnancy, or her maternity leave; that she was reassigned to the position of Development Secretary because she was not able to satisfactorily perform the functions of her previous position as Executive Assistant; and that she was not "constructively discharged" but rather chose to voluntarily resign her employment with the defendant.
*1235 Plaintiff brings this action alleging sex discrimination based on pregnancy. Plaintiff's Complaint, Count I, paragraphs 13 and 14[5]; Plaintiff's Response to Defendant's Motion for Summary Judgment, pg. 1. However, she specifically claims that she was discriminated against because of her status as a "new mother". Plaintiff's Deposition, Vol. I., pgs. 137-39; Vol. II., pgs. 101-04.
Title VII provides that it is unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's ... sex ..." 42 U.S.C. § 2000e-2(a)(1). The Pregnancy Discrimination Act (PDA) amended Title VII in 1978 by providing that:
"the terms `because of sex' or `on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes ... as other persons not so affected but similar in their ability or inability to work ..."
42 U.S.C. § 2000e(k).
After reviewing the parties' pleadings and relevant caselaw, the Court finds that a primary significant issue is not addressed by the parties but which this Court believes must be addressed preliminarily. It is this Court's belief that plaintiff does not state a cognizable disparate treatment cause of action because her status as a "new mother" is not a protected trait under the PDA.[6]
In a footnote, plaintiff attempts to bring plaintiff's claim within the purview of the PDA by stating the plaintiff's status as a new mother is a "biological reality" and that "courts have routinely found that adverse actions taken against a women [sic] after she returns from maternity leave can be based on a woman's pregnancy." Plaintiff's Response to Defendant's Motion for Summary Judgment, pg. 10, n. 11. In support of this statement, plaintiff cites two district court cases outside of Missouri and the Eighth Circuit: E.E.O.C. v. Continuity Programs, Inc., 841 F.Supp. 218 (E.D.Mich.1993) and Timus v. Secretary of Labor, 782 F.Supp. 122 (D.D.C.1991). In both of these cases, the plaintiff claimed that she was discriminated against with regard to her maternity leave; i.e. by virtue of taking maternity leave, the defendant allegedly treated the plaintiff discriminatorily. In the instant case, Ms. Piantanida specifically testified that her lawsuit is based only on her status as a "new mother". She testified throughout her deposition that none of the defendant's administrators ever said or did anything remotely discriminatory with regard to the fact that she was pregnant and/or took maternity leave.
Q. And did you have any reason to believe that Linda Waugh had held or was holding the fact that you were going on maternity leave against you prior to April 20th?
A. No.
Q. And did you have any reason to believe that Lorrie Goecker was holding the fact that you were going on maternity leave against you prior to April 20th?
A. No.
Q. Did Linda Waugh ever  has Linda Waugh ever said anything to you that led you to believe she has held it against you that you went on maternity leave?
A. No.
Q. Has Lorrie Goecker ever said anything to you that led you to believe that she holds it against you because you went on maternity leave?
A. No.
Q. Has Mr. Hilliard ever said anything to you that indicates to you that he held it against you that you went on maternity leave?
A. No.

*1236 Q. Did Linda Waugh ever say anything to you that led you to believe that she held it against you that you were  because you were pregnant?
A. No.
Q. Did Lorrie Goecker ever say anything to you that indicated that she held it against you that you had become pregnant?
A. No.
Q. Did Mr. Hilliard ever saying [sic] anything that led you to believe that he held it against you that you became pregnant?
A. No.
Q. So it would be fair to say the sole reason you think that your demotion was caused by  well, you tell me what it is that you think that the change in the job structure with you was related to your maternity leave?
A. I was told by Dave Hilliard that he told Lorrie Goecker to create a position for a new mom to handle.
Q. Okay. Was there any  was there anything else.
A. This new position being created is the main reason, because there's no justification that this position should be made, other than now I have a new baby and I wouldn't be capable of doing the job.
Q. So this was related not to your pregnancy, not to your maternity, but being a new mother?
A. Correct.
Q. Did Linda Waugh ever say anything that led you to believe that she thought you would not be able to function in this job as a new mother?
A. No.
Q. Did Lorrie Goecker ever say anything that led you to believe that she thought that you would not be able to function in this job because you were a new mother?
A. No.
Q. So is it fair to say that the sole comment that you're relying upon is the comment that you allege Mr. Hilliard said, that this would be a good job for a new mom?
A. Correct.
Q. Was there anything else at Wyman that you think was responsible for moving you into this new job?
A. No.
Q. Did anyone in management  well, did anyone at Wyman ever make adverse comments to you about going on maternity leave?
A. No.
Q. Did anyone at Wyman ever make a [sic] adverse comment to you about being pregnant?
A. No.
Plaintiff's Deposition, Vol. I., pgs. 137-140.
(The following questions and answers were given in reference to Plaintiff's Exhibit 20  Hilliard's notes regarding his telephone conversation with plaintiff on April 23, 1993.)
Q. Do you remember him discussingg the fact Wyman was surprised at extent of the jobs that were incomplete after you left on maternity leave?
A. That Linda was surprised.
Q. Okay. Do you remember Mr. Hilliard staying [sic] that the same thing would have happened had he been aware of the extent of the nonperformance prior to you leaving on leave?
A. Something to that affect.
_________________
Q. Did you see anything else in there that you disagree with?
A. No. 5 is correct. No. 6 was not stated in my capacity, it was stated that he asked Lorrie and Linda to provide a job that a new mom could handle. More or less like he was being nice that he was looking at my best interest that I had a new baby.
Q. Did he say anything else other than I am looking at a new job that a new mom could handle?
A. That would be my capability at that time. That I would come into the position that he was creating and it would be something less, so that I could be  so that would be my capabilities and they would be less.
Q. Did he discuss with you what their concerns about your capacity were before?
A. No.
Q. Before you had your baby?
A. No.
_________________

*1237 Q. Did Linda Waugh ever say anything to you about you in your limited or lessened capacity in your role as a new mother?
A. Linda didn't discuss anything about that.
Q. I mean ever?
A. Ever.
Q. Did Lorrie Goecker ever discuss with you any limited capacity you would have as a new mother?
A. No.
Q. Other than that comment that you attributed to Mr. Hilliard, did anybody ever make a comment about a lessened capacity that you would have as a new mother?
A. Not that I recall.
Plaintiff's Deposition, Vol. II., pgs. 101-04.
Other courts, including the Eighth Circuit Court of Appeals, have analyzed and applied the PDA by looking at its legislative history and intent. In Carney v. Martin Luther Home, Inc., 824 F.2d 643 (8th Cir. 1987), the Eighth Circuit, after carefully reviewing the PDA's legislative history identified two reasons for its enactment: 1) to require employers who provide disability benefits to their employees to extend those benefits to women who are unable to work due to pregnancy-related conditions; and 2) to prevent the differential treatment of women in all aspects of employment based on the condition of pregnancy. Carney, at 646; Armstrong v. Flowers Hospital, Inc., 33 F.3d 1308 at 1316 (11th Cir.1994); Krauel v. Iowa Methodist Medical Center, 915 F.Supp. 102, 112 (S.D.Iowa 1995). Accordingly, "[t]o the extent that a pregnant employee is able and willing to work, in spite of her concerns regarding risk to the fetus, the PDA protects her right to remain in the work place", Armstrong, at 1316; and if unable to remain in the work place on account of her pregnancy, the PDA requires "employers to who provided disability benefits to their employees to extend such benefits to women who are unable to work due to pregnancy-related conditions.", Carney, at 646 (citations omitted).
Pursuant to the underlying purposes of the PDA, courts have construed the PDA as prohibiting differential treatment of women based on pregnancy, childbirth, or related medical conditions. In interpreting this limitation, especially the phrase "related medical conditions", courts have routinely linked it to medical conditions directly attributable to pregnancy or childbirth. "Commentators have agreed that `[b]y broadly defining pregnancy discrimination, Congress clearly intended to extend protection beyond the simple fact of an employee's pregnancy' to include `related medical conditions' such as nausea or potential miscarriage." Carney, at 648 (citations omitted). In Krauel, supra, the district court found the PDA inapplicable to a plaintiff's claim regarding infertility treatment. It held that "[i]nfertility, unlike pregnancy or childbirth, is not a medical condition that is sex-related because both men and women can be infertile." Krauel, at 113. It further found that the PDA's protection only extended to matters concerning the "childbearing process". Id., at 113. In Wallace v. Pyro Mining Co., 789 F.Supp. 867 (W.D.Ky.1990), the district court in Kentucky held that an employer's denial of an employee's request for personal leave due to her inability to wean her child from breast-feeding did not constitute discrimination on the basis of sex or violate the PDA. The court reviewed the legislative history of the PDA and concluded that the phrase "related medical conditions" referred exclusively to disabilities caused or contributed to by pregnancy, miscarriage, abortion, childbirth and recovery therefrom. Id., at 869. The court concluded that Congress intended that "related medical conditions" be limited to "incapacitating conditions for which medical care or treatment is usual and normal." Id., at 869. Finally, the district court in Illinois found the PDA inapplicable to a claim of discriminatory treatment in connection with childcare. The Court found that "[t]here is nothing inherently sex-related about child care, however,  either parent may care for a child." Paseur v. W.W. Grainger, Inc., 52 Fair Em. Prac.Cases 789, 790 (N.D.Ill.1989).
In the instant case, plaintiff does not claim discrimination because she was pregnant or because she took maternity leave. She doesn't claim that other employees, male or non-pregnant females, were treated differently with regard to medical leave. Her claim is solely differential treatment by virtue of being a "new mother"; i.e. having a *1238 custodial parental relationship with a child. As the Illinois district court found in Paseur, supra, there is nothing inherently sex-related about being a parent  both men and women can be a "new parent".
It is this Court's considered opinion that plaintiff's status as a "new mother" is "not sufficiently analogous to the specific terms in the PDA" and therefore, does not come within the protection of the PDA. See, Krauel, at 112.
Assuming arguendo that the plaintiff's claim of discrimination as a "new mother" comes within the purview of the PDA, the same type of analysis used in other Title VII sex discrimination cases is required in this pregnancy discrimination action. Armstrong v. Flowers Hospital, Inc., 33 F.3d 1308, 1313 (11th Cir.1994); Brinkman v. State Dept. of Corrections, 863 F.Supp. 1479, 1485 (D.Kan.1994); LaFleur v. Westridge Consultants, Inc., 844 F.Supp. 318, 324 (E.D.Tex.1994). As will be shown, plaintiff fails to produce sufficient evidence showing a material issue of fact exists on whether the defendant treated the plaintiff less favorably than others because of her pregnancy, childbirth, and/or related medical conditions.
A plaintiff in a Title VII discrimination case can proceed in one of two ways. Stacks v. Southwestern Bell Yellow Pages, 996 F.2d 200 (8th Cir.1993). When a plaintiff produces direct evidence, such as statements by decisionmakers clearly showing that age was a motivating factor in the employment decision; or at least significant circumstantial evidence showing a specific link between the discriminatory animus and the challenged employment decision, the burden-shifting standards established by Price-Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), come into play. Stacks v. Southwestern Bell Yellow Pages, 996 F.2d at 201 n. 1; Beshears v. Asbill, 930 F.2d 1348, 1353 (8th Cir.1991). In the absence of such evidence, the guidelines set forth in McDonnell-Douglas v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) are applicable. Stacks v. Southwestern Bell Yellow Pages, 996 F.2d at 202; Johnson v. Minnesota Historical Society, 931 F.2d 1239, 1242-43 (8th Cir.1991); Halsell v. Kimberly-Clark, 683 F.2d 285, 289 (8th Cir.1982), citing, Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981), cert. den., 459 U.S. 1205, 103 S.Ct. 1194, 75 L.Ed.2d 438 (1983).
Plaintiff contends that Hilliard's alleged comment that he directed that a new job be created which plaintiff could handle as a "new mother" is direct evidence of pregnancy discrimination, thus, the Price Waterhouse test is applicable.
If a plaintiff can produce evidence which demonstrates that an illegitimate criterion (in the present case, race) was a motivating factor in the challenged employment decision, then the burden-shifting framework of Price Waterhouse is applied. Under Price Waterhouse, once the plaintiff establishes that the illegitimate criterion was a motivating factor in the challenged employment decision, the burden of persuasion shifts to the defendant employer to show that it would have made the same decision absent the illegitimate criterion. Stacks v. Southwestern Bell Yellow Pages, 996 F.2d at 202; Beshears, at 1353. The Price Waterhouse burden shifting only applies "when there truly are mixed motives: when the company has a valid interest and there is evidence of discrimination as a motivating factor in the decision." Stacks v. Southwestern Bell Yellow Pages, 996 F.2d at 202 citing Price Waterhouse, 490 U.S. at 260, 109 S.Ct. at 1795.
The Eighth Circuit Court of Appeals has specifically addressed the issue of what constitutes direct evidence sufficient to meet the plaintiff's burden under Price Waterhouse. In Beshears, supra, the Court noted that such evidence does not include "stray remarks in the workplace", "statements by nondecisionmakers", or "statements by decisionmakers unrelated to the decisional process itself". Id., at 1354 quoting Price Waterhouse, 490 U.S. at 277, 109 S.Ct. at 1804; Stacks v. Southwestern Bell Yellow Pages, 996 F.2d at 202; see also, Kriss v. Sprint Communications Co., Ltd. Partnership, 58 F.3d 1276 (8th Cir.1995). The Beshears Court went on to note that such evidence may include "evidence of actions or remarks of the employer that reflect a discriminatory attitude" and "[c]omments *1239 which demonstrate a discriminatory animus in the decisional process, or those uttered by individuals closely involved in employment decisions". Id., at 1354 quoting Price Waterhouse, 490 U.S. at 277, 109 S.Ct. at 1804; Kriss, at 1282; Stacks v. Southwestern Bell Yellow Pages, 996 F.2d at 202-03. Thus, the plaintiff's burden is to produce evidence (of statements, comments, actions) which demonstrate a causal relationship to the challenged employment decision. Sargent v. Paul, 16 F.3d 946, 948 (8th Cir.1994).
Firstly, the Court notes that there is no evidence before this Court which indicates that Hilliard made such a statement to the plaintiff other than her unsubstantiated allegation in her deposition. Other than her deposition testimony, plaintiff claims that Hilliard does not deny making this statement and offers defendant's response to plaintiff's Interrogatory No. 10 as proof (Plaintiff's Exhibit 17). The Court has carefully looked at Exhibit 17, particularly Interrogatory No. 10 and defendant's response, and finds nothing to support this assertion. Interrogatory No. 10 and the response states:
10. Identify each and every person who participated in the decision to change, or to attempt to change, plaintiff's position in April 1993. For each such person:
a) state such person's job title with defendant; and,
b) describe in detail such person's role in the decision.
ANSWER: David Hilliard, Linda Waugh (Development Director) and Lorrie Goecker (Office Manager) all participated in the decision to change, or attempt to change, Plaintiff's position. They met and discussed Plaintiff's deficiencies.
There is no reference to any statement made by Hilliard in which he directed Waugh and/or Goecker to create a job for plaintiff as a "new mother". Both plaintiff and defendant have submitted extensive portions of the deposition testimony of Hilliard, Waugh, and Goecker. Nowhere in their deposition testimony is there any reference to such a statement being made by Hilliard. Plaintiff has submitted Hilliard's notes of his April 23rd conversation with plaintiff. Plaintiff's Exhibit 20. Nowhere in these notes is there any reference to any statement made by Hilliard regarding plaintiff's status as a "new mother". Nowhere in defendant's pleadings is there any concession that such a statement was made; defendant simply presents argument as to why such an alleged statement, if made, would not constitute direct evidence of pregnancy discrimination.
Even assuming that Hilliard made the statement attributed to him, the Court finds that it is nothing more than an isolated stray remark in the workplace. Hilliard was one of three people involved in the decision to change plaintiff's position. Plaintiff does not dispute the fact that Waugh was her immediate supervisor and had authority to hire and fire her subordinates as she deemed necessary. Since plaintiff contends that reassigning her to the position of Development Secretary was intended to force her to resign, nothing inherent in this alleged statement reflects any discriminatory intent in removing plaintiff from her position as Executive Assistant. See, Kriss, at 1281 (male manager referring to one woman as a "bitch", another woman as "ugly", and joking about the "attractiveness" of a third woman are not proof of gender discrimination). This one alleged remark is insufficient to justify application of the Price Waterhouse test.
McDonnell Douglas, supra, established a three-part analysis for Title VII disparate treatment cases.[7] Under McDonnell Douglas, a Title VII plaintiff must first establish a prima facie case of intentional discrimination by a preponderance of the evidence. If the plaintiff successfully establishes a prima facie case of intentional discrimination, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the challenged employment action. If the defendant employer meets this burden of production, the plaintiff employee must show by a preponderance of evidence that the articulated reason(s) for the challenged employment action are pretextual and that the illegitimate criterion was the motivating reason. *1240 At all times the plaintiff employee possesses the ultimate burden of proving to the Court that s/he was the victim of intentional discrimination. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); Favors v. Fisher, 13 F.3d 1235, 1237-38 (8th Cir.1994); Webb v. Missouri Pacific R. Co., 826 F.Supp. 1192, 1211 (E.D.Ark.1993).
"The elements necessary to establish a prima facie case vary according to the circumstances of the alleged discrimination." Favors v. Fisher, at 1237 quoting Jones v. Frank, 973 F.2d 673, 676 (8th Cir. 1992); see also Williams v. Ford Motor Co., 14 F.3d 1305, 1308 (8th Cir.1994). In this PDA disparate treatment case, in order for Ms. Piantanida to establish her prima facie case, she must demonstrate that 1) she is a member of a protected group; 2) that she was qualified for her position; 3) that she suffered an adverse employment decision; and 4) that she was replaced by someone outside of the protected class of comparable qualifications. See, Armstrong v. Flowers Hosp., at 1314; Afande v. National Lutheran Home for the Aged, 868 F.Supp. 795, 801 (D.Md.1994); LaFleur v. Westridge Consultants, at 324.
As for the first element, the Court assumes (for purposes of this analysis only) that plaintiff is a member of the protected class pursuant to the PDA. As for the second element, the Court finds that plaintiff has produced sufficient evidence that she was minimally qualified for her job (her job performance evaluation was generally positive and no corrective job action reports were written regarding the plaintiff). Defendant's evidence of inadequate job performance that allegedly triggered the adverse employment action is not a proper consideration for determining whether plaintiff has met this element of her prima facie case. See, Gill, at 379; Davenport v. Riverview Gardens School District, 30 F.3d 940, 944 (8th Cir.1994). Plaintiff has met the third element of her prima facie case[8] by producing sufficient evidence that the reassignment was viewed as a demotion. As for the fourth element, the parties fail to address whether plaintiff was replaced, in her position as Executive Assistant, by someone outside the protected class. Instead they argue over whether an employee named Kathy Jaster filled the position offered to plaintiff (Development Secretary) at a higher salary than offered to plaintiff. However, there is no dispute, that at least for the period of time plaintiff was on maternity leave, she was replaced first by Rose Duckett, and then by Dorothy Beavens (both nonpregnant employees[9]). Consequently, the Court finds that plaintiff has satisfied the fourth element.
Having presumably established her prima facie case, a presumption exists that Wyman unlawfully discriminated against plaintiff. In order to rebut this presumption, Wyman must sufficiently set forth legitimate, nondiscriminatory reasons for plaintiff's demotion. If Wyman succeeds, the presumption drops away from the case.
Defendant contends that plaintiff was offered a different job better suited to her capabilities (and at a salary reflective of this entry-level position) because she had demonstrated an inability to manage the workload, especially with regards to the timeliness of contribution acknowledgements. Defendant contends that plaintiff was not offered the new position until she had gone on maternity leave because the extent of her job performance deficiencies was not discovered until Ms. Beavens temporarily took over plaintiff's duties. Defendant has produced extensive deposition testimony and documentation regarding plaintiff's need for frequent assistance with her workload, Ms. Waugh's on-going concern regarding plaintiff's ability to stay focused and complete her work assignments in a timely manner, and the discovery of a large number of overdue acknowledgements. The Court finds that *1241 defendant has met its burden of articulating a legitimate, non-discriminatory reason for demoting plaintiff to an entry-level position.
To survive defendant's summary judgment motion and meet the third stage of the McDonnell Douglas analysis, plaintiff must now "establish the existence of facts which, if proven at trial, would permit a jury to conclude that the defendant's proffered reason is pretextual and that intentional discrimination was the true reason for the defendant's actions." Krenik v. County of Le Sueur, 47 F.3d 953, 958 (8th Cir.1995). Ms. Piantanida must demonstrate that the reasons advanced by Wyman are pretextual and that the real motive for her demotion was her status as a "new mother".
Plaintiff contends that the defendant's reasons for demoting her are pretextual for essentially three reasons: 1) defendant did not follow its disciplinary policy; 2) the new position of Development Secretary was given to Kathy Jaster at twice the salary offered to plaintiff; and 3) plaintiff's job performance deficiencies were the fault of Ms. Waugh. The fatal flaw in plaintiff's attempt to meet the burden of the third stage of the McDonnell Douglas analysis is that none of these contentions demonstrate that plaintiff was treated less favorably on the basis of being a "new mother"; i.e. that defendant treated plaintiff (upon returning from maternity leave as a "new mother") any different from others returning from (non-pregnancy related) medical leave.
Plaintiff goes to great lengths arguing that she was "not guilty" of the deficiencies cited by the defendant. She does not dispute the fact that she signed off on her job performance evaluation agreeing that she had weaknesses with completing projects and meeting deadlines, especially with acknowledgements. She does not deny that Ms. Waugh brought to her attention her concerns about plaintiff's on-going problems keeping up with the workload. She testified that she "frequently" went to Ms. Goecker to get extra help with her workload. She does not deny that the old acknowledgements discovered during her maternity leave were, at least in part, ones that she had been assigned to complete prior to her maternity leave. What plaintiff argues is that Ms. Waugh's "supervisory deficiencies" were the cause of plaintiff's work deficiencies. A great portion of her response is dedicated to presenting a defense to the defendant's legitimately articulated business reason for her demotion. She believes that none of the complaints regarding her job performance are valid, therefore the decision to demote her must be discriminatory. Essentially, she argues that the defendant's reasons are pretextual and by inference and supposition, a jury will find discrimination. This is not sufficient to sustain her burden under Hicks.
In St. Mary's Honor Center v. Hicks, supra, the Supreme Court clearly found that the burden of persuasion remains with a plaintiff in an employment discrimination case, and the plaintiff must produce evidence which not only shows that the proffered reasons for the challenged employment decision are pretextual but also that the adverse employment action was motivated by an illegitimate criterion (in this case, status as a "new mother"). Hicks, 509 U.S. at 514-17, 113 S.Ct. at 2751-52. This burden exists in a summary judgment review; i.e. plaintiff must produce evidence that supports an inference that defendant's decision was intentional discrimination based upon an illegal motivation. See, Banks v. City of Independence, 21 F.3d 809, 810 (8th Cir.1994). Ms. Piantanida must set forth specific facts which establish a genuine issue of material fact with respect to the discriminatory intent of Wyman. This she has not done.
Plaintiff's criticism of Ms. Waugh's performance and effectiveness as her supervisor is not the issue here. This Court does not sit in judgment as to whether Ms. Waugh was a good supervisor. Title VII (and accordingly, the PDA) does not entitle this Court to "sit as a super-personnel department that reexamines an entity's business decisions." Ruby v. Springfield R-12 Public School District, 76 F.3d 909, 912 n. 7 (8th Cir.1996); Krenik, at 960 (citations omitted). Whether plaintiff was or was not ultimately responsible for the delinquencies of the subject acknowledgements (as well as defendant's assertions of on-going problems with completing assignments in a timely manner) is "irrelevant because [this evidence] *1242 merely questions the soundness of the [supervisor's decision]". Gill, at 379 citing Davenport, at 944. The Court is not permitted to second-guess the plaintiff's supervisors or correct a bad business decision if the decision was based on non-discriminatory reasons.
As for plaintiff's contention that defendant did not follow its disciplinary policy, even if true, this fails to demonstrate a discriminatory intent. Even if plaintiff's job performance deficiencies did not warrant a demotion; or plaintiff should have been subject to graduated corrective action reports, this contention still only questions the soundness of defendant's decision to demote and does not show discrimination on the basis of plaintiff returning from maternity leave as a "new mother". The same is true for plaintiff's contention that Ms. Jaster was given the job offered to plaintiff at a higher salary. Plaintiff has the burden of establishing that the position filled by Ms. Jaster was the same position offered to the plaintiff; i.e. involved the same duties, skill, education, and responsibilities. Plaintiff's only evidence is the job description for the position she was offered and the job description for the position held by Ms. Jaster. Defendant contends that Ms. Jaster performed the duties listed as well as additional tasks. Plaintiff offers no specific facts or affirmative evidence that Ms. Jaster performed no other tasks other than the ones listed on the job description, or more importantly, that Ms. Jaster was paid more because she was not a "new mother".
In order to demonstrate disparate treatment, a plaintiff must show that other "similarly situated" employees outside her protected class were not subject to the same challenged employment action. See, Jones v. Frank, 973 F.2d 673 (8th Cir.1992). In meeting the ultimate burden of persuasion, Ms. Piantanida must show that defendant treats "new mothers" (i.e. women returning from maternity leave with a new baby at home[10]) less favorably than other similarly situated employees returning from non-pregnancy related medical leaves. Plaintiff has failed to present any evidence that other employees who took a medical leave of absence for non-pregnancy related conditions and did not return to work as a "new mother" were treated differently. Plaintiff does not name a single other similarly situated non-maternity leave or non-"new mother" employee treated differently upon returning to work. Defendant, on the other hand, presents unrefuted evidence that several women employees, upon returning to work after maternity leave or non-maternity leave, were either reinstated to their same positions or chose to return to work in a different capacity. Hilliard Deposition, pgs. 113-115; Plaintiff's Exhibit 20, Interrogatory Nos. 19 and 20 and defendant's responses thereto; Plaintiff's Exhibit 23, Interrogatory No. 19 and defendant's supplemental response thereto. The bottom line is that there is absolutely no evidence in the record that defendant treated "new mothers", including the plaintiff, any differently from "non-new mothers". See, Brinkman v. State Dept. of Corrections, at 1487; Ulloa v. American Exp. Travel Related Services, 822 F.Supp. 1566, 1571 (S.D.Fla.1993). In short, Ms. Piantanida has failed to adduce sufficient evidence that would allow any reasonable juror to conclude that plaintiff was treated differently from similarly situated employees outside of her protected class (i.e. employees returning from medical leave as "non-new mothers").
It is not within this Court's judicial purview to adjudge the "correctness" of the defendant's decision to demote the plaintiff. An employer has the right to make a business decision regarding its employees as it sees fit, absent intentional discrimination. "There is no principle of law that requires that a business' decision be popular with employees. As long as the decision is not based on unlawful [sex or pregnancy] discrimination, `the courts have no business telling [companies] ... how to make personnel decisions, which may be objectively or subjectively based.'" Walker v. AT & T Technologies, *1243 995 F.2d 846, 850 (8th Cir.1993) quoting Neufeld v. Searle Laboratories, 884 F.2d 335, 340 (8th Cir.1989); see also, McLaughlin v. Esselte Pendaflex Corp., 50 F.3d 507, 512 (8th Cir.1995); Bradford v. Norfolk Southern Corp., 54 F.3d 1412, 1421 (8th Cir.1995) citing Jorgensen v. Modern Woodmen of America, 761 F.2d 502, 505 (8th Cir.1985); Lidge-Myrtil v. Deere & Co., 49 F.3d 1308, 1311 (8th Cir.1995). To survive summary judgment at the third stage of the McDonnell Douglas analysis, plaintiff must make a sufficient evidentiary showing that the defendant's proffered reason(s) for the challenged employment action is pretextual and that the actual motive for its action is intentional discrimination based on sex, or in the instant case, the alleged protected trait under the PDA of "new mother". Hazen Paper Co. v. Biggins, 507 U.S. 604, 609-13, 113 S.Ct. 1701, 1706-07, 123 L.Ed.2d 338 (1993); Hicks, 509 U.S. at 506, 113 S.Ct. at 2747; Krauel, at 111. Having reviewed the record presented, the Court finds that the plaintiff has failed to set forth sufficient affirmative evidence demonstrating that a genuine issue of material fact on the issue of pretext and the ultimate issue of intentional discrimination exists. Defendant is therefore entitled to judgment as a matter of law on plaintiff's PDA claim of discriminatory demotion.
Plaintiff next claims that defendant forced her to quit by reducing her salary. She contends that defendant knew plaintiff would resign in response to the reduced salary.
A constructive discharge "occurs when an employer intentionally renders working conditions so intolerable that an employee is essentially forced to leave the employment." Bradford v. Norfolk Southern Corp., 54 F.3d 1412, 1420 (8th Cir.1995) (citations omitted); Jenkins v. Wal-Mart Stores, Inc., 910 F.Supp. 1399, 1418 (N.D.Iowa 1995). "Work conditions are deemed intolerable if a reasonable employee would find them as such." Bradford, at 1420 citing Maney v. Brinkley Mun. Waterworks & Sewer Dept., 802 F.2d 1073, 1075 (8th Cir.1986). "Part of an employee's obligation to be reasonable is an obligation not to assume the worst, and not to jump to conclusions too fast." Smith v. Goodyear Tire & Rubber Co., 895 F.2d 467, 473 (8th Cir.1990) quoting Garner v. Wal-Mart Stores, Inc., 807 F.2d 1536, 1539 (11th Cir.1987). Furthermore, the employee must show that the employer's actions were taken with the intent of forcing the employee to quit. Smith v. World Insurance Co., 38 F.3d 1456, 1461 (8th Cir.1994); Jenkins, at 1418. This intent requirement may be met if the employee can demonstrate that his/her resignation was the foreseeable consequence of their employer's alleged discriminatory action. World Ins. Co., at 1461; Hukkanen v. Int'l Union of Operating Engineers, Hoisting & Portable Local No. 101, 3 F.3d 281, 284-85 (8th Cir.1993); Jenkins, at 1418. "If there is no evidence that the defendant took actions with an intent to force the plaintiff to quit, even if conditions were intolerable, plaintiff's claim fails." Jenkins, at 1418 citing Craft v. Metromedia, Inc., 766 F.2d 1205, 1217 (8th Cir.1985).
Although an employee's personal circumstances may "conceivably be relevant to a determination of constructive discharge", an employee must produce evidence that the employer was aware of those personal circumstances and that this awareness was a factor in the employer's alleged discriminatory action. Bradford, at 1417; Smith v. Goodyear Tire & Rubber Co., 895 F.2d at 473.
Plaintiff's decision to resign her employment with defendant was a purely economic decision. At her deposition plaintiff clearly stated her reason for tendering her resignation:
Q. At a certain point you tendered your resignation to Wyman?
A. Correct.
Q. And why is it that you did that?
A. Because I couldn't afford to come back.
Q. When you say couldn't afford to come back, why is it that you couldn't afford to come back?
A. $750 a month is not a whole lot to be able to pay child care and any other little expenses I had.
Q. When you say any little expenses you had, what do you mean?
A. Associated with me going back to work.

*1244 Q. Besides child care, were there other expenses?
A. Well, I have college reimbursement that I am paying off with my salary.
--------------------
Q. When you were unemployed, what would you pay your student loans back with?
A. When I was unemployed when?
Q. Well, after you resigned from Wyman?
A. After I resigned, my unemployment check.
Q. And after your unemployment ran out or after you ceased getting unemployment, what did you pay your student loans back with?
A. Whatever means I could.
Q. Were you making a decision then that it was more cost effective for you to receive unemployment than it was to go back to work?
A. For me to go back to work I would be paying to work.
------------------
Q. And if you didn't work for Wyman, then your only source of paying the student loans would then be unemployment?
A. That's correct.
Q. So that did you make the decision that it was  you would be better off just accepting unemployment rather than going back to work?
A. Restate that.
Q. Did you make a decision that you would be economically better off collecting unemployment than you would be going back to work at Wyman for $750 a month?
A. Not only economically based.
Q. Did you make a decision there [sic] you would be economically better off by collecting unemployment rather than going back to Wyman at $750 a month?
A. If you put it that way, I guess.
Q. Besides economically, what other ways would you be better off by not returning to Wyman?
A. I would like to have a job that paid me more, and being unemployed gave me the opportunity to go off and look for a job, rather than be employed and not able to interview.
Q. So that continuing to work for Wyman would have interfered with your opportunity to look for other jobs?
A. That's correct.
Q. Besides the economic incentive to quit and the time that it gave you to look for other jobs, were there any other reasons why you quit rather than returning to Wyman?
A. No.
Q. Do you recall when it was that you decided to return or to quit? When was it that you made the decision to quit?
A. After I researched what it would cost to send my child to day care and after we figured out that I would be paying to work. That's when I said it would be better off for me to look for a job while being unemployed.
Q. When you say paying to work, you're including in that money that you would spend on your college loans; right?
A. Correct.
Q. Do you recall when it was that you figured the economics of your decision out?
A. Not specifically.
Q. Do you remember what month it was?
A. May 1993.
Plaintiff's Deposition, Vol. I., pgs. 107-110.
At her deposition plaintiff unequivocably testified that the only reasons she tendered her resignation was 1) after figuring out her child care costs, coupled with her student loans, $750/month would not be enough; and 2) it would be easier for her to take unemployment and look for a job, than try to look for a job while employed. In an attempt to create a material issue of fact, plaintiff now submits her affidavit which states additional reasons for her decision to resign; i.e. the offered position would "not further her career or make use of her college degree" and she "had no reason to believe that Wyman would ever increase my salary" and that defendant would have "simply continued to take adverse actions to attempt to force me to quit or to discharge me." Plaintiff's Exhibit 3. Although ambiguities and some conflicts in deposition testimony are matters generally left to a jury to resolve, a court may grant summary judgment "where *1245 a party's sudden and unexplained revision of testimony creates an issue of fact where none existed before." Wilson v. Westinghouse Electric Corp., 838 F.2d 286, 289 (8th Cir. 1988). "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own earlier testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." Camfield Tires, Inc. v. Michelin Tire Corp., 719 F.2d 1361, 1365 (8th Cir.1983); see also, Sorenson v. First Wisconsin Nat'l Bank of Milwaukee, 931 F.2d 19, 21 (8th Cir.1991); Wilson, at 289. The Camfield Court went on to note that "[i]f testimony under oath, however, can be abandoned many months later by the filing of an affidavit, probably no cases would be appropriate for summary judgment." Camfield, at 1365. The Court is not impressed by the plaintiff's attempt to create issues of material fact regarding her allegation of constructive discharge by her affidavit which contradicts her clear deposition testimony.
Plaintiff received notice of her new job position on April 20, 1993. She confirmed this with Hilliard on April 23, 1993. By plaintiff's own account, as of May 12, 1993, she was prepared to go back to work on June 1st. Furthermore, by plaintiff's own account it was not until she began investigating childcare costs in May 1993 that she decided to tender her resignation on May 24, 1993. Plaintiff offers no evidence that she discussed with anyone at Wyman her childcare arrangements prior to taking maternity leave. Plaintiff offers no evidence that she discussed with anyone at Wyman her student loans prior to taking maternity leave. By plaintiff's own account, she did not even begin investigating childcare costs until May 1993, after she had already received notice of the new job assignment. Defendant has submitted evidence that other entry-level employees in secretarial positions had a salary similar to the one offered to the plaintiff. Plaintiff offers no evidence that defendant, at the time the decision to reassign plaintiff was made, had any reason or any facts at its disposal which would have made it aware of plaintiff's child care costs and student loans and that $750/month would not be enough to cover such costs. Even if this Court were to find that $750/month was a ridiculously low salary so as to make plaintiff's working conditions "intolerable", there is no evidence that this salary was offered with the intent to force plaintiff to quit. Plaintiff's constructive discharge claim fails.
It is clear that the plaintiff disagrees with the nature and substance of her supervisors' criticisms of her job performance; however, there is nothing in the record to dispute defendant's evidence that there was a factual basis for its decision to reassign plaintiff to an entry-level position and that her supervisors honestly believed that although plaintiff was a decent, hardworking individual, she was not able to keep up with the demands of the job as Executive Assistant. Summary judgment will be granted to the defendant.
NOTES
[1] Actually, plaintiff does not allege discrimination on the basis of pregnancy, but rather on the basis of her status as a "new mother". This distinction will be specifically addressed later in this memorandum.
[2] In some instances the parties have filed duplicate exhibits. In such cases, the Court will cite to only one of the exhibits. This is solely for purposes of clarity and expediency; the cited exhibit is not to be viewed as any indication of the merits of either party's position for which the exhibit has been cited.
[3] As soon as possible.
[4] Several times the parties' counsel cite to deposition testimony, especially of the plaintiff, which has not been provided to the Court. For example, on pg. 4 of defendant's substituted memorandum in support of motion for summary judgment (# 12), counsel cites to Plaintiff's Deposition, Vol. II., pgs. 13, 18-19; however, counsel's filed deposition exhibit begins on page 29 and continues therefrom. On page 5 of plaintiff's response to defendant's motion for summary judgment, counsel cites to Plaintiff's Deposition, Vol. II., pgs. 12-13; however, counsel's filed deposition exhibit begins on page 102 and continues therefrom. In the future, counsel is advised to file the deposition pages which are cited to in their briefs.
[5] Count II of plaintiff's complaint is a state-law claim, under the Missouri Human Rights Act (MHRA), of sex discrimination on the basis of pregnancy also.
[6] Plaintiff's complaint and pleadings purport to bring her action pursuant to Title VII. However, the PDA specifically amended Title VII to prohibit discrimination on the basis of pregnancy. Since plaintiff consistently alleges discrimination on the basis of pregnancy, her "sex discrimination" claim is actually a claim pursuant to the PDA.
[7] The McDonnell Douglas analysis is equally applicable to claims brought under the MHRA. Gill v. Reorganized School District R-6, Festus, Mo., 32 F.3d 376, 378 (8th Cir.1994) (citations omitted).
[8] By finding that the plaintiff has met the third element of her prima facie case, the Court does not imply any substantive ruling on whether plaintiff has made a case for constructive discharge. Plaintiff's claim for constructive discharge will be dealt with later in this memorandum.
[9] There is nothing before the Court which indicates whether or not these two women were "new mothers".
[10] Plaintiff fails to define exactly what she means by "new mother" as a protected trait under the PDA. The Court presumes that by "new mother" Ms. Piantanida contends that she was discriminated against because she was returning to work as a woman having given birth to her first child and retaining physical custody of that child; as opposed to a woman returning to work having given birth to additional children.